## JARVIS v. PAGUE.

### Opinion delivered January 27, 1919.

1. SALES—AUTHORITY OF AGENT.—When one puts into the possession of his agent a drove of horses and mules, and authorizes him to sell them, such express authority carries with it the apparent power to collect the proceeds of such sale.

2. SAME — AUTHORITY OF SUB-AGENT.—Where the seller shipped horses and mules to an agent to sell them, and did not object when informed by the agent that he had employed a sub-agent to sell them, the latter had apparent authority to receive the price, and the buyer got title by paying him, though the seller understood, without the buyer's knowledge, that the price would be paid to the agent.

Appeal from Nevada Circuit Court; *George R. Haynie,* Judge; reversed.

#### STATEMENT OF FACTS.

This action was brought by plaintiffs below (appellees here), B. H. Pague and P. Pague against the defendants, one Williams and Grover Jarvis (appellant here), to recover the possession of twenty-seven mules and five horses.  Williams was not served and therefore passes out of the suit.

The appellees alleged that they were the owners of the animals; that they brought the stock from New Mexico to Nevada County, Arkansas, for sale; that one Williams was employed to assist in the sale of the stock under a contract whereby when a sale was made the proceeds thereof were to be paid to the appellees; that Williams and Jarvis conspired together to defraud the appellees out of the stock; that appellant claimed that he had bought the stock from Williams and had paid for same and that Williams had left the county.  They alleged that Williams had no right to receive money or convey title to the property.  They prayed for writ of replevin,

and that the animals be returned to them and for the sum of $500 as their damages for their unlawful detention. They filed with their complaint an affidavit describing the animals and giving the value of each, and setting up that they were entitled to immediate possession of the property and that same was unlawfully detained by appellant under a false claim of ownership and setting forth the other essentials in an affidavit for replevin.

The appellant in his answer alleged that P. Pague and one Williams came to Rosston, Nevada County, with horses and mules for sale; that Williams represented himself as the sole owner of the stock; that Pague declared to appellant and others that Williams was the owner of the stock and advised appellant and others to purchase the stock from Williams; that appellant relying upon such representations purchased the stock from Williams and paid therefor the sum of $2,600 in cash, the same being their reasonable market value; that appellant relying upon the representations of P. Pague purchased the stock of Williams believing that he was the owner of the same; that he bought the stock in good faith and if Williams was not the owner the appellants were estopped from asserting title thereto on account of the representations made by P. Pague, who was intrusted by B. H. Pague with the care of the stock.

Appellant denied the allegations of fraud and prayed for judgment for his costs.

The facts are substantially as follows: B. H. Pague, a citizen of New Mexico, shipped a car load of horses and mules to Arkansas, consigned to his brother P. Pague, who was his agent to sell the stock. At Fort Worth, Texas, P. Pague entered into a written contract with one Williams which is substantially as follows: Whereas Pague is the owner of 33 head of horses and mules and desires to sell the stock it is agreed between Pague and Williams that Williams shall sell the stock and pay to Pague the sum of $2,580, the residue, if any, to go to Williams as his compensation for the sale of the

stock. Pague shall go with Williams and remain with him until the stock are sold. The payments above made, and the money shall be turned over to Pague as fast as the horses and mules are sold until he gets his $2,580. Williams was to pay Pague and his son $1.50 each per day until the stock was sold. The stock was to be sold in thirty days and if not sold by that time all stock remaining unsold was to be turned back to Pague.

B. H. Pague, the owner of the stock, came to Texarkana where he first met Williams. There, P. Pague, his brother and agent, informed him that he had a contract with one Williams for the sale of the stock. He explained what the agreement was but he did not inform his brother that it was a written contract. After being informed as to the contract with Williams, B. Pague said that it was all right as Williams was not to receive any of the money and was only to find buyers for the stock. P. Pague, the agent, went to Rosston where they met with Grover Jarvis, the appellant.

P. Pague testified that Jarvis told him that he had bought the stock from Williams and had an order for them. He told Jarvis that the stock did not belong to Williams and refused to give them up. But Jarvis went and took the stock out of the field where they were being pastured, without his, Pague's, consent.

Appellant objected to the testimony as to the conversation between P. Pague and his brother B. Pague in regard to the terms of the contract and also the testimony as to the conversation had with Willams in the absence of appellant. Jarvis at the time he claimed to have purchased the stock paid P. Pague the sum of $20. P. Pague never signed any bill of sale of the stock; he never admitted to Jarvis that he had signed. He told Jarvis to look to Williams but not to take the stock. When P. Pague entered into the contract with Williams, at Forth Worth, Williams paid him as expense money the sum of $5. When Jarvis paid P. Pague the $20 saying that Williams had sent the same to him, Jarvis offered him a note from Williams which

Pague refused. The substance of the note, dated October 27, 1911, was that Williams had gone to Texarkana on business and requested Pague to meet him there and stating that he would settle with him in full and also informed Pague that Jarvis had settled with him, Williams, in full for all the stock. After Jarvis claimed to have purchased the stock from Williams, Jarvis and Williams were seen talking together three times and witness became suspicious of them, that was after witness had informed Jarvis that the money would have to be paid to witness.

Appellant testified that Pague and Williams came to his place with a bunch of horses. Witness asked Pague what he would take for the whole bunch. Williams was present. Pague said "they do not belong to me, they belong to Williams." Next day Williams came and asked witness if he was interested in the stock. They closed the trade for same, and witness and his brother went with Williams to Waldo where witness paid Williams $2,600. Williams gave witness $20 to give to Pague and the note above referred to. Witness took a bill of sale of the stock. He got the bill of sale after he paid Williams. After witness paid Williams he (Williams) stated that he wasn't coming back. Witness questioned him about Pague signing the bill of sale and Williams stated that Pague signed it and showed witness a receipt signed by Pague and asked witness to compare the handwriting. The bill of sale to witness was dated at Rosston, October 27, 1911, and was as follows: "This is to certify that we W. G. Williams and P. Pague have this day sold and delivered to C. G. Jarvis thirty-two head of stock, twenty-five mules, five mares, two horses, for the sum of $2,600 paid to me in hand, the title of which we will ever defend, more definitely described as stock now in J. T. Luck's pasture at Rosston." Signed, "W. J. Williams, P. Pague." Williams had the money in his pocket when witness first learned that Pague had an interest in the stock. When witness went back home to Rosston and saw Pague he offered Pague the $20 and note. Pague received the $20. He at first refused to receive the note

but afterwards took the same and told witness not to move the stock. Witness informed Pague that he expected to move them. Williams had told witness that Pague would put the stock in witness' field while they were gone and witness expected to find them there when he returned.

There was testimony tending to corroborate appellant to the effect that Pague told parties who were seeking to buy the stock from him that the stock belonged to Williams; that Williams had the fixing of the price. There was testimony tending to prove that Jarvis only paid Williams $800 for the stock which was shown to be worth the sum of $2,600.

· Among others, appellees prayed for instructions No. 2 and No. 8, as follows:

"No. 2. If you find from the evidence in this case that P. Pague was the agent of his brother, B. H. Pague, for the purpose of selling the mules and horses in controversy; that the plaintiff, B. H. Pague, was the true owner; that P. Pague and Williams entered into a contract in writing in regard to the sale of said stock in the absence of and without the knowledge of said B. H. Pague, and afterwards the plaintiff, B. H. Pague, when informed of the nature of the contract instructed the said P. Pague and the said Williams that the contract would stand only on condition that no money was to be paid Williams, and that the money received for the sale of the stock should be paid by the purchaser to the said P. Pague and should not pass into the hands of Williams, then you are instructed that the said Williams had no authority to sell said stock and receive the money for the same, and any sale so made was void, if one was so made."

"No. 8. If you find from the evidence that B. H. Pague, the owner, shipped this car of stock in the care of his brother, P. Pague, who was authorized to sell and collect for same, then you are told that P. Pague, himself an agent, had no authority to authorize Williams, another agent, to sell and collect for the stock, and if he did so and B. H. Pague did not ratify such contract with Wil-

liams, P. Pague could not by this act estop the owner to deny Williams' authority to sell and collect when he, the said P. Pague, could not authorize the said Williams to sell and collect.''

The appellant specifically objected to appellee's prayer No. 2 ''because there was no evidence that Jarvis knew of the limitation on the employment of Williams; because B. H. Pague knew of and did not object to the contract and is bound thereby; because P. Pague was the agent of B. H. Pague, acting within the scope of his employment, and the contract shows Williams had right to sell the stock and collect the money.''

Appellant objected to prayer No. 8 ''because the proof shows that B. H. Pague knew of the existence of the contract and is bound thereby.''

The appellant among others, offered the following prayers:

''No. 1. The jury are instructed that a principal is bound by the acts of his agent coming within the scope of his direct or implied authority and the agent is authorized to do all things which are necessary, proper, usual and reasonable to be done in order to perfect the purpose for which the agency was created, and in this case, if you find from the evidence that B. H. Pague shipped a car load of horses and mules to Arkansas and turned them over to his brother, P. Pague, as his agent, to sell, and that said P. Pague, in order to effect the sale of said stock, employed one Williams to assist him, and that B. H. Pague knew of his employment and did not object thereto, and that said Williams sold the stock, then the jury are instructed that B. H. Pague is bound by the action of his brother in employing Williams and in the sale of the stock by Williams, and even if the jury should find that Williams only had power to sell and not to receive the money, but that this limitation was not known to Jarvis, still the plaintiff will be bound by the action of Williams in receiving and accepting the money, and if the defendant in good faith bought the stock and paid

the money to Williams he was not bound to see that Williams paid the money over to Pague.''

"No. 6.  Gentlemen of the jury, under the law it is the duty of the court to construe the contract in evidence, and the court construes such contract as follows:  The intention and meaning of said contract is that the said Williams was to sell the stock in question and receive the money and to pay the money over to Pague; and the court further construes said contract to mean that whoever purchased said stock was authorized, under said contract, to pay money to said Williams, and it was not the duty of said purchaser to see that the money was paid over to Pague by Williams.''

The court refused prayer No. 1, and gave prayer No. 6 with a modification, to which rulings the appellant duly excepted.

The jury returned a verdict in favor of the appellees, and from the judgment rendered in their favor is this appeal.

*C. C. Hamby* and *R. P. Hamby,* for appellant.

The court erred in its instructions to the jury.

The principal is bound by all the acts of his agent coming within the general scope of his authority, unless the knowledge of a limited agency is brought home to all who deal with such agent.  114 Ark. 300; 96 Ark. 456; 77 Ark. 364; 55 Ark. 627; 49 Ark. 320; 48 Ark. 138.

The contract having been entered into between P. Pague, the general agent, and Williams, and acquiesced in by B. H. Pague, the principal, he could not accept part of the employment and secretly repudiate part and bind the purchaser.  The principal cannot secretly and privately limit the authority of his agent.  55 Ark. 627; 96 U. S. 84; 48 Ark. 138.

It is a well settled proposition of law that where one of two persons must suffer by the acts of a third person, that the one most at fault, and who invited the act, must suffer.  42 Ark. 97.

Every delegation of authority, whether general or special, express or implied, unless its extent be other-

wise expressly limited by the same instrument, conferring it, carries with it the power to do all things necessary, proper, usual and reasonable to effectuate the purpose for which it was created. 96 Ark. 456.

A principal who permits his agent to deal with his (the principal's) property as his (agent's) own, must take the contract as the agent made it. 50 Ark. 380.

An agent may exceed his authority and bind his principal, if the acts done were necessary to accomplish the purpose for which the agency was created. 96 Ark. 456.

*McRae & Tompkins* and *J. O. A. Bush,* for appellee.

Counsel review the evidence and contend that the judgment is right, and should stand.

WOOD, J., (after stating the facts). The court erred in its instructions to the jury.

In *Keith* v. *Herchberg Optical Co.,* 48 Ark. 138-145 (see, also, *Liddell* v. *Sahline,* 55 Ark. 627-29), the court said: "A special agency exists where there is a delegation of authority to do a single act. A general agent is where there is a delegation to do all acts connected with a particular business or employment."

In the recent case of *Brown* v. *Cone,* 130 Ark. 86, the facts were, that one Cone, living at Montrose, Arkansas, sent his agent, John Shaw, to Eudora, Arkansas, to sell a carload of mules for him. Shaw sold two mules to Brown for the sum of $300, and there was testimony which tended to prove that Shaw warranted the mules to be sound in every respect. There was also testimony tending to prove that the mules were unsound. Brown sued Cone setting up the warranty and alleging that the mules were unsound. Cone testified at the trial that Shaw did not have authority to warrant the soundness of the mules. The testimony tended to show that Cone was a dealer in mules and that Shaw was his general agent for the sale of them.

After giving the definition of a general agent as above we said: "There is some conflict of authority in

the decisions as to whether the general agent of a horse dealer has the implied authority to warrant the soundness of the horses intrusted to him for sale. We believe that the better reasoning is that he has such power. The underlying principle is that the agent, being in charge of the sale of the horses. is intrusted with all powers proper for making the sale, and that a warranty of quality and soundness is usually necessary for the proper performance of that power. Cone was a dealer in horses and shipped them out to nearby towns in carload lots in charge of Shaw to sell them. Shaw had full power to control the terms of sale. This included power to do everything usual and necessary to its accomplishment. It is perfectly evident that Shaw would be very much hampered in the sale of the horses if he did not have the power to warrant their soundness. Shaw was in charge of the business of selling the horses for Cone, and when he warranted the soundness of a horse sold by him, he may be fairly presumed to be acting within the scope of his authority.''

The doctrine announced in the above case rules this.

The testimony shows conclusively that P. Pague was the general agent of the appellee for the purpose of selling the animals in controversy. The authority of P. Pague, the general agent, could not be delegated by him to Williams, but it is unnecessary to determine whether the written contract in evidence was was binding on B. Pague, for the reason that the undisputed testimony of the appellee and his brother P. Pague showed that B. Pague was informed by his brother that he had entered into a contract with Williams whereby Williams was ''to find buyers for the stock and make prices,'' in other words to sell the stock, but that the money paid for the stock when sold was to be turned over to B. Pague.

The uncontroverted evidence shows that B. Pague himself ratified the contract, as he understood it, whereby his brother acting as agent contracted with Williams to sell the animals in controversy, the understanding be-

tween them being that the proceeds of the sale should be paid to Pague.

Giving appellee the benefit of the contract according to his own construction of it, it expressly authorized Williams to find buyers and fix prices for the animals. Williams and P. Pague had possession of the animals according to appellee's own testimony for the purpose of making a sale of the same, but with the above limitations as to how the money should be paid.

Now when one puts into the possession of his agent a drove of horses and sends him out clothed with authority to find buyers and fix prices on the same, in other words— to sell them, such express authority carries with it the apparent power to collect the proceeds of such sale. How else could he complete a sale. A buyer dealing with an agent vested with such express authority could not know of any secret limitations upon the agent's power.

The rule is, "a principal is bound by all that is done by his agent within the scope of his apparent power and can not avoid the consequences of his acts because no authority was in fact given to him to do them unless they were in excess of the apparent authority or were done under such circumstances as to put the persons dealing with him upon notice or inquiry as to his real authority." 49 Ark. 320-23.

The testimony does not disclose any circumstances which would put a person dealing with Williams on notice that Williams did not have apparent authority to sell the animals.

In *Rogers* v. *Scott,* 128 Ark. 600-3, we said: "The general rule is that no man can get a title for personal property from a person who had no title to it. There are, however, certain exceptions to the general rule. One of these exceptions is, that, a *bona fide* purchaser will be protected where the owner has conferred upon the seller the apparent right of property as owner, or for disposal as his agent."

That principle is applicable to the facts which the testimony in this record tended to establish, and the court erred in not recognizing this in its charge to the jury.

The rulings of the court upon the prayers for instructions set forth in the statement showed that the court ignored the doctrine of apparent authority as above announced. It follows that the court erred in granting appellee's prayer for instruction No. 2 and in refusing to grant appellee's prayer for instruction No. 1 and in modifying and giving as modified appellant's prayer for instruction No. 6. Appellant's prayer No. 6 as offered was a correct instruction of the written contract between P. Pague and Williams.

We deem it unnecessary to discuss in detail the other rulings upon the instructions. What we have already announced will be sufficient to guide the court on a new trial. It is not improper to say, however, that we find no other errors in the rulings of the court.

For those indicated, therefore, the judgment is reversed and the cause is remanded for a new trial.