Syllabus.

## Richmond.

## BOICE V. FINANCE AND GUARANTY CORPORATION.

### March 18, 1920.

1. TRADERS' ACT—*Section 2877 of the Code of 1904 does not Apply to Purchaser.*—Section 2877 of the Code of 1904 provides that: "If any person transact such business in his own name, * * * all the property, stock, and choses in action acquired or used in such business shall, as to the creditors of any such person, be liable for the debts of any such person."

   *Held:* That the language of the statute plainly restricts it to *creditors* of such person, and the statute cannot by construction be extended to include *purchasers* from such person.

2. STATUTES—*Construction.*—Where the language is not uncertain, it is not permissible to interpret that which needs no interpretation.

3. CHATTEL MORTGAGES—*Stock and Trade.*—A chattel mortgage cannot be given on goods and chattels actively used in trade by one who continues to exercise the dominion of owner over the same.

4. CHATTEL MORTGAGES—*Goods Intended for Sale by Retail Dealer.* —One cannot take from a retail dealer a chattel mortgage on goods and chattels which he knows the retailer intends to place in his stock and offer for sale indiscriminately to his customers in the usual and ordinary course of business, and thereafter claim them from a purchaser for value from the retail dealer, who had no actual notice of the existence of the mortgage, although the same was recorded.

5. CHATTEL MORTGAGES—*Goods Intended for Sale by Retail Dealer— Size of Article.*—Property bought for the express purpose of daily indiscriminate sale to the general public, exposed for such sale at the place of business of a licensed dealer, and over which the dealer is permitted to exercise the dominion of owner, cannot be made the subject of a valid chattel mortgage regardless of its size, value, or capacity for identification. The powers which the dealer is permitted to exercise over the property in such case are inconsistent with a mortgage thereon.

6. CHATTEL MORTGAGES—*Goods Intended for Sale by Retail Dealer—*

*Size of Article—Case at Bar.—*In the instant case a licensed dealer in automobiles gave a chattel mortgage upon an automobile which he placed, with the knowledge of the agent of the mortgagee, in his salesroom among other automobiles for sale.

*Held:* That although the chattel mortgage was recorded, it was null and void as against a purchaser without actual knowledge.

7. CHATTEL MORTGAGES—*Goods Placed on Sale—Notice of Mortgagee—Sales—Title of Seller—Exercise of Dominion Over Goods.*—It is true that, as a rule, the seller of personal chattels cannot confer upon a purchaser any better. title than he himself has; but if the owner stands by and permits a seller, who is a licensed dealer in such goods, to hold himself out to the world as owner, to treat the goods as his own, place them with other similar goods of his own in a public showroom, and offer the same indiscriminately with his own to the public, he will be estopped by his conduct from asserting his ownership against a purchaser for value without notice of his title. The constructive notice furnished by a recorded mortgage or deed of trust in such cases is not sufficient. The act of knowingly permitting the goods to be so handled and used by the seller in the ordinary and usual conduct of his business is just as destructive of the rights of the creditor as if such permission had been expressly granted in the mortgage or deed of trust.

8. MAXIMS—*Two Equally Innocent Persons.*—Where one of two equally innocent persons must suffer, he should bear the burden whose conduct has induced the loss.

9. CHATTEL MORTGAGES—*Provision Against Sale by Mortgagor—Waiver.*—Although a chattel mortgage expressly provided that if the mortgagor should attempt to sell, secrete, convert, or remove the property without the written consent of the mortgagee, the mortgagee might immediately take possession of the property, this provision could be waived by the mortgagee; and where the mortgagor placed the property on sale in his salesroom, with the knowledge of the mortgagee, this constituted such waiver, and it is immaterial whether the permission to use the property as owner was given contemporaneously with or subsequent to the mortgage.

10. PRINCIPAL AND AGENT—*Knowledge of. Agent as Knowledge of Principal—Agent of Mortgagee.*—Where a guaranty company acting through an agent took a chattel mortgage upon an automobile of a licensed dealer, the knowledge of the agent that the automobile was placed in the salesroom of the dealer for the purpose of sale is chargeable to the principal.

Error to a judgment of the Law and Equity Court of city of Richmond, in an action of detinue. Judgment for plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*Williams & Mullen,* for the plaintiff in error.

*Munford, Hunton, Williams & Anderson,* for the defendant in error.

Burks, J., delivered the opinion of the court.

Boice purchased an automobile of W. F. Gordon, a licensed dealer in automobiles in the city of Richmond, paid him the purchase price and took possession of the automobile. Gordon had previously given a mortgage on the automobile, which was duly recorded, to secure a loan of money obtained from the Finance and Guaranty Corporation. The loan was not paid, and the Finance and Guaranty Corporation, hereinafter called the guaranty company, brought this action of detinue to recover possession of the automobile, and there was a judgment in its favor in the trial court. To that judgment this writ of error was awarded.

The facts of the case were agreed between the parties and are set forth in a written stipulation signed by counsel for both parties, and made a part of the record. So far as need be stated for the purposes of this opinion they are, as follows: For some time prior to November 4, 1916, W. F. Gordon was a licensed dealer in automobiles, and was engaged in business at 1631 west Broad street, Richmond, Virginia, where he conducted an automobile business and had a sales room and show room where he displayed new

and second-hand automobiles for sale, and during this time he was agent for National automobiles in Richmond. Sometime prior to November 4, 1916, Gordon ordered two automobiles from the National Company, one of them being the automobile here in controversy, which the company shipped subject to their order, "notify Gordon," and drew a sight draft on him for the purchase price, with a bill of lading attached. When Gordon was notified of the arrival of the automobiles, he obtained a loan from the guaranty company, of Baltimore, for the sum of $2,148, which, together with other money of his own, he used to take up the draft. The draft was paid, the bill of lading obtained and possession of the two automobiles delivered November 10, 1916. In order to secure the loan aforesaid, Gordon executed his notes to the guaranty company, and a chattel mortgage on the automobiles dated November 4, 1916. The mortgage was duly recorded November 4, 1916. The mortgage and the notes were then delivered to Cary P. Carr, of Richmond, who had looked after the execution and the acknowledgment of the mortgage, and who is conceded in briefs to have been the agent of the guaranty company, and he forwarded them on November 4, 1916, to the guaranty company in Baltimore, Md. On November 6, 1916, the guaranty company issued its check payable to the order of Gordon for the net amount of the loan, and forwarded it to their agent, Cary P. Carr, at Richmond, who delivered it to Gordon on November 10, 1916. Gordon, as stated, paid the draft on him and took possession of the automobiles November 10, 1916. Boice bought the car of Gordon and paid for it in the latter part of January, 1917, but at that time had no actual knowledge of the existence of the mortgage. The guaranty company loaned Gordon money on chattel mortgages on eight cars, six of which are the subject of suits. There were four of these mortgages, each covering two cars, and they were dated, respectively, November 4, 1916; December 28, 1916;

January 30, 1917, and March 12, 1917. The loans in each of these cases were negotiated through Cary P. Carr. Sometime early in May, 1917, the guaranty company sent its agent to Richmond to check up the cars in Gordon's possession upon which it held mortgages. Gordon then admitted that he had sold cars to other persons upon which the guaranty company held mortgages, and upon demand, furnished a list of persons to whom he had made such sales, the dates of the sales, and the identification numbers of the cars. This list embraces eight cars, and among them the car sold to Boice. The mortgage on the latter car is still unsatisfied and unreleased of record.

It is fairly plain from the record that Carr was a resident of the city of Richmond; that he negotiated the loans to Gordon; that he knew of Gordon's place of business, and that he was a licensed dealer in automobiles; that he knew that Gordon was fairly exposing and offering for sale to the general public the automobiles placed in his showroom or salesroom, and that the automobiles upon which he took the mortgages were bought for sale, and were placed in said salesroom for that purpose. While all of these facts do not expressly appear in the record, they are fair inferences from what does appear. Gordon's place of business was on one of the principal business streets of the city. He had a large salesroom from which he was actively engaged in selling automobiles, and Carr had negotiated loans from the guaranty company on at least four chattel mortgages. He looked after the due acknowledgment and recordation of the mortgages, and it is a fair inference that he was acquainted with the method in which Gordon was conducting his purchases and sales.

Gordon and his vendor are eliminated from this controversy. The sole question presented for our consideration is who has the superior claim to the automobile, the Finance and Guaranty Corporation, which advanced the money on

the chattel mortgage which was duly recorded, or Boice, who was a subsequent purchaser for value of the automobile from Gordon, without actual notice of the existence of the mortgage.

[1, 2] Counsel have elaborately argued, both orally and in their briefs, several phases of the case which we have not undertaken to set forth specifically, and which will not be considered because deemed unnecessary in the view we take of the facts. One of these views, however, will be briefly noticed. It was earnestly insisted that what is known as the trader's act was applicable to the case. That act is embodied in section 2877 of the Code of 1904. So much of that section as is invoked is in the following words: "If any person transact such business in his own name * * * all the property, stock and choses in action acquired or used in such business shall, as to the creditors of any such person, be liable for the debts of any such person." The language of the statute plainly restricts it to *creditors* of such person, and the statute cannot by construction be extended to include *purchasers* from such person without reading into the statute language which the legislature has not seen fit to place there. As has been often said, it is not permissible to interpret that which needs no interpretation. The statute has no application to the case.

[3, 4] The substantial question for our consideration is: Can a chattel mortgage be given on goods and chattels actively used in trade by one who continues to exercise the dominion of owner over the same? Or can one take from a retail dealer a chattel mortgage on goods and chattels which he knows the retailer intends to place in his stock and offer for sale indiscriminately to his customers in the usual and ordinary course of business, and thereafter claim them from a purchaser for value from the retail dealer, who had no actual notice of the existence of the mortgage, although the same was recorded?

From *Lang* v. *Lee*, 3 Rand. (24 Va.) 410, decided in 1825, until the present time, it has been uniformly held by this court that such a mortgage as is first mentioned on a stock of goods, wares and merchandise, or in fact any mortgage on that class of goods which contains provisions adequate to defeat its purposes, is "null and void as against creditors and purchasers" of the grantor. The cases are too numerous to cite, but see *Consolidated Tramway Co.* v. *Germania Bank*, 121 Va. 331, 93 S. E. 572; *Addington* v. *Etheridge*, 12 Gratt. (53 Va.) 436; *Perry* v. *Shenandoah National Bank*, 27 Gratt. (68 Va.) 755; *Brockenborough* v. *Brockenborough*, 31 Gratt. (72 Va.) 590, and cases cited.

[5, 6] The reason of the rule is that it is a fraud upon third persons. To uphold such a mortgage would give to the mortgagor a fictitious credit and allow him to pose before the world as the owner of goods when such is not the fact. Purchasers from him and those who extend him credit on the faith of his ostensible ownership of the goods will not be subjected to loss on that account. It is manifestly unjust that they should be. Is there anything then in the character of automobiles that should put them in a different category from ordinary goods, wares and merchandise? It is true that they are bulky and are easily susceptible of accurate description and continued identification through the medium of the registry laws. They also involve the expenditure of considerable sums of money. But this is the mere statement of a fact, not a reason for the supposed distinction. The same may be said of many articles of personal property not subject to such a mortgage. Neither size, value nor identification marks can exempt an article from the application of the principle involved. Property bought for the express purpose of daily indiscriminate sale to the general public, exposed for such sale at the place of business of a licensed dealer, and over which the dealer is permitted to exercise the dominion of owner, cannot be

made the subject of a valid chattel mortgage, regardless of its size, value or capacity for identification. The powers which the dealer is permitted to exercise over the property in such case are inconsistent with a mortgage thereon.

It is a matter of common knowledge, and will therefore be judicially noticed, that in the large cities there are department stores in which a customer can buy almost anything from a nut-cracker to a threshing machine, from a doll carriage to an automobile. It would never occur to a customer that he must be on his guard to see whether the article was bulky, of large value and easily susceptible of identification, and if so to examine the registry for liens thereon. Besides many of the articles carried in such stores would be on the border line, and it would be unreasonable to require a purchaser to determine what could be mortgaged and what could not. To require an examination of the records for liens in such cases would break up the business, and indeed be an embargo on legitimate trade. Capital must seek a more substantial security for its protection. Otherwise it were better that the few should suffer than the general public who have been lured into purchasing from a dealer who has been entrusted with the indicia of ownership. A purchaser in such case is not bound to see to the application of the purchase money.

[7] It is true that, as a rule, the seller of personal chattels cannot confer upon a purchaser any better title than he himself has, but if the owner stands by and permits a seller, who is a licensed dealer in such goods to hold himself out to the world as owner, to treat the goods as his own, place them with other similar goods of his own in a public showroom, and offer the same indiscriminately with his own to the public, he will be estopped by his conduct from asserting his ownership against a purchaser for value without notice of his title. The constructive notice furnished by a recorded mortgage or deed of trust in such cases is not

sufficient. The act of knowingly permitting the goods to be so handled and used by the seller in the ordinary and usual conduct of his business is just as destructive of the rights of the creditor as if such permission had been expressly granted in the mortgage or deed of trust.

It is well said in *McNeil* v. *Tenth National Bank*, 46 N. Y. 325, 329 (7 Am. Rep. 341, 343) : "It must be conceded that as a general rule, applicable to property other than negotiable security, the vendor or pledgor can convey no greater right of title than he has. But this is a truism predicable of the simple transfer from one party to another where no other element intervenes. It does not interfere with the well established principle that where the true owner holds out another, or allows him to appear, as the owner of or as having full power of disposition over the property, and innocent third parties are thus led into dealing with such apparent owner, they will be protected. Their rights in such case do not depend upon the actual title or authority of the party with whom they deal directly, but are derived from the act of the real owner, which precludes him from disputing, as against them, the existence of the title or power which, through negligence or mistaken confidence, he caused or allowed to appear to be vested in any party making the conveyance."

[8] In this as in other cases, the principle is that where one of two equally innocent persons must suffer, he should bear the burden whose conduct has induced the loss.

In *Saltus* v. *Everett*, 20 Wend. 267, 32 Am. Dec. 541, it was held that the owner of property could not reclaim it where he had "by his own voluntary act or conduct given to another such evidence of the right of selling his goods as, according to the custom of trade, or the common understanding of the world, usually accompanies the authority of disposal; or, to use the language of Lord Ellenborough, when the owner 'has given the external indicia of the right

of disposing of his property.' Here it is well settled that, however the possessor of such external indicia may abuse the confidence of his principal, a sale to a fair purchaser' divests the first title, and the authority to sell so conferred, whether real or apparent, is good against him who gave it." Again, in the same case, it is said: "The owner may lose the right of recovering his goods against purchasers by exhibiting to the world a third person as having power to sell and dispose of them; and this, not only by giving a direct authority to him, but by conferring an implied authority. Such an authority may be implied by the assent to and ratification of prior small dealings, so as to hold such person out to those with whom he is in the habit of trading as authorized to buy or sell. It may be inferred from the business of the agent with fit accompanying circumstances. 'If a man,' says Bayley, J., in *Pickering* v. *Buck*, 15 East 44, 'puts goods into another's custody, whose common business it is to sell, he confers an implied authority to sell.' * * * But this implied authority must arise from the natural and obvious interpretation of facts according to the habits and usages of business, and it never applies where the character and business of the person do not warrant the reasonable presumption of his being empowered to sell property of that kind. If, therefore, * *. * a person intrust his watch to a watchmaker to be repaired, the watchmaker is not exhibited to the world as an owner or agent, and credit is not given as such because he has possession of the watch. The owner, therefore, would not be bound by his sale." See also note 25 Am. Dec. 611.

In *South Bend Iron Works* v. *Reedy*, 5 Pennewill, 361, 60 Atl. 698 (Delaware Superior Court, 1905), certain agricultural implements were consigned and sold to a purchaser for the express purpose of being resold by him as a retail dealer and jobber in such goods. There was no restriction on his power to sell except as to the territory. In the sale,

however, the seller retained the title to the goods until they were paid for. It was held that a purchaser in good faith who had no knowledge of the transaction between the parties, acquired good title as against the seller.

In *Sears* v. *Shrout,* 24 Ind. App. 313, 56 N. E. 728, there was a sale of a boiler and engine and a set of corn burrs and a cob crusher. At the time of the sale a chattel mortgage was given by the purchaser which was duly recorded. It was held by the court that "where goods are sold and delivered to be resold by the vendee, a reservation of title in the vendor is void as to purchasers from the vendee at retail and in the ordinary course of business. Such a sale and delivery are inconsistent with the continued ownership by the vendor." The court cites in support of this proposition, *Mfg. Co.* v. *Carman,* 109 Ind. 31, 9 N. E. 707, 58 Am. Rep. 382, and *Hench* v. *Eacock,* 21 Ind. App. 444, 52 N. E. 85.

The same doctrine is announced and supplied in *McCarthy* v. Crawford, 238 Ill. 38, 86 N. E. 750, 29 L. R. A. (N. S.) 252, 128 Am. St. Rep. 95; *Diaz* v. *Chickering,* 64 Md. 348, 1 Atl. 709, 54 Am. Rep. 770; *Levi* v. *Booth,* 58 Md. 305, 42 Am. Rep. 332. The principle involved is fully discussed in the last mentioned case, but it is also said there that "the *bare possession* of goods by one, though he may happen to be a dealer in that class of goods, does not clothe him with power to dispose of the goods as though he were the owner, or as having authority as agent to sell or pledge the goods, to the preclusion of the right of the real owner. If he sells as *owner* there must be some other indicia of property than mere possession. There must * * be some act or conduct on the part of the real owner, whereby the party selling is clothed with the apparent ownership, or authority to sell, and which the real owner will not be heard to deny or question to the prejudice of an innocent third party dealing on the faith of such appearance."

It is unnecessary for us to pass upon the effect of *bare possession,* as the instant case, in our judgment, comes within the latter proposition stated in the above quotation.

*State Bank* v. *Johnson,* 104 Wash. 550, 177 Pac. 340, 3 A. L. R. 235, from the Supreme Court of the State of Washington, has been cited as taking a different view. The facts of that case are very different from those in the case at bar, but they are too lengthy to be here set forth. It was conceded in that case that the purchaser of the automobile had no constructive notice of the vendor's bill of sale, though recorded. The decision, which was adverse to the purchaser, was based upon the ground that the vendor had no title to the automobile and hence could convey none. The court said: "If the vendor has no title, the vendee acquires none, unless the one having title has by act or neglect estopped himself from disputing the vendee's claim of title so acquired. It seems plain *there is no such estoppel here.*" (Italics supplied.) It is further to be observed that Washington is one of a number of States which holds that a mortgage which permits the mortgagor to remain in possession and sell the mortgaged property in the usual course of trade does not render the mortgage fraudulent *per se,* and the existence of fraud in such cases is a question of fact to be submitted to the jury. *Ephriam* v. *Kelleher,* 4 Wash. 243, 249, 29 Pac. 985, 18 L. R. A. 604. This is in direct conflict with the settled doctrine of this State. The difference in the facts of the two cases and in the decisions of the two States is sufficient to show why we cannot follow the conclusion reached in that case.

[9] The chattel mortgage here in controversy expressly provided that if the mortgagor "should attempt to sell, secrete, convert or remove the property without the written consent of the mortgagee," the latter might immediately enter the premises of the mortgagor or other place where the mortgaged property might be, "and take possession of

the property, without notice or demand * * * and immediately sell the property at public or private sale, without notice but this was not done. On the contrary, the property was put in the public salesroom, offered for sale indiscriminately to the public and sold for cash to the plaintiff in error to whom possession was immediately delivered. If the chattel mortgage had contained a provision expressly permitting to be done what was in fact done, there can be no doubt, under our decisions, that it would have been held to have been void *per se* as to a purchaser from Gordon. But how is the case different, if at the time the mortgage was executed, or subsequently, the guaranty company consented that Gordon should make the use of the property which he subsequently made? It would be a travesty upon justice and a fraud on the rights of third persons to permit a creditor to take such a chattel mortgage as was taken in this case and immediately destroy its effect by permitting a use of the property inconsistent with the terms of the mortgage. It is immaterial whether the permission to use the property as owner was given contemporaneously with or subsequent to the mortgage. In either event it has the same effect as if it had been set out in the mortgage. The law on this subject is well expressed in 5 Am. & Eng. Encl. Law (2d ed.) 994, as follows: "Any agreement outside the instrument, permitting the sale and retention of the proceeds, whether contemporaneous with or subsequent to the execution of the instrument, will have the same effect as if stipulated in the mortgage." Many cases are cited in the notes in support of the text.

[10] In the case at bar, the seller was a licensed dealer in automobiles in the city of Richmond. He had a large salesroom where he exhibited automobiles for sale on one of the principal streets of the city, and made numbers of sales there. The automobile in controversy was purchased from the manufacturers for sale. It was exhibited for sale

at said salesroom, and was actuallly sold to Boice, who paid therefor in cash, without actual knowledge of any claim thereto of the guaranty company. The guaranty company took mortgages on machines purchased by Gordon on November 4, 1916; December 28, 1916, and Jenuary 30, 1917; Boice purchased in the latter part of January, 1917. So there had been at least two or three mortgages at the time of Boice's purchase. In taking each of these mortgages the guaranty company was represented by its agent, Cary P. Carr, of Richmond, Virginia, and it cannot be doubted that in these frequent dealings between Carr and Gordon, the former became acquainted with Gordon's methods of buying and selling automobiles. While the mortgage stipulates expressly against sale, conversion or removal of the automobiles without the written consent of the guaranty company, the stipulation was waived if its violation was knowingly permitted by the guaranty company. It is not expressly stated in the agreed statement of facts that Carr, the agent of the guaranty company, had knowledge of the fact that the automobile was placed in the salesroom of Gordon for the purpose of sale, or that he knew of Gordon's methods of making his purchase and sales of automobiles, but we regard these facts as proper, if not necessary, inferences from the facts agreed. The knowledge of Carr was thus obtained in the course of his employment, and is chargeable to his principal. The guaranty company, in taking the mortgage under such circumstances, can stand on no higher footing than one who sells to a retailer and gives him the power of sale to his customers, or who accepts a mortgage containing provisions adequate to defeat its purpose.

We are of opinion that the mortgage given by W. F. Gordon to the Finance and Guaranty Corporation, dated November 4, 1916, is null and void as to the claim of C. Boice, the plaintiff in error, to the automobile in controversy, and

therefore the judgment of the Law and Equity Court of the city of Richmond, Virginia, will be reversed; and this court, proceeding under section 6365 of the Code to enter such judgment as to it seems right and proper, doth reverse the said judgment of the Law and Equity Court of the city of Richmond, and doth order and adjudge that the action of the Finance and Guaranty Corporation (plaintiff in the trial court and defendant in error in this court) be dismissed, and that C. Boice (defendant in the trial court and plaintiff in error in this court) recover of the said Finance and Guaranty Corporation his costs expended in his defense in the trial court and also in this court.

*Reversed.*