## Richmond

JAMES D. MCQUAY v. MOUNT VERNON BANK AND TRUST COMPANY, ET AL.

May 4, 1959.

Record No. 4915.

Present, Eggleston, C. J., and Buchanan, Miller, Whittle, Snead and I'Anson, JJ.

The opinion states the case.

*Paul Lee Sweeny*, for the plaintiff in error.

*James M. Thomson*, for the defendants in error.

MILLER, J., delivered the opinion of the court.

An action for damages was instituted by James D. McQuay against Mount Vernon Bank and Trust Company and Andrew W. Clark, trustee, in which it was alleged that defendants had wrongfully taken

possession of and sold a 1952 Lincoln automobile upon which they claimed to hold a lien, when the car was in fact owned by plaintiff who had purchased it from a used car dealer in the regular course of business and for value. Defendants asserted that the bank held a valid lien upon the automobile when McQuay purchased it and that they had enforced the lien and made sale of the car and were not obligated to McQuay in any amount.

None of the litigants demanded a jury and all matters of law and fact were submitted to the court for decision. The court determined that the defendant bank held a valid lien on the automobile when McQuay purchased it and that the seizure, repossession and sale of the car were legal, and defendants were not liable to McQuay in any amount. Recovery was denied, and from that judgment, we granted McQuay an appeal.

On January 17, 1955, Charles Lawrence Racine, a licensed retail used car dealer, sold a 1952 Lincoln automobile to James D. McQuay for the sum of $1,595.00. The purchase price was paid by check of $1,020.00, cash of $200, and $375 allowed McQuay as the trade-in value of his 1949 Dodge automobile.

For six years prior to the date of the sale, Racine had been engaged in business as a used car dealer in Arlington, Virginia, under the name of Racine Motor Company, and during the last eighteen months his business had been located at 3100 North 10th street. He had carried an active account at the Mount Vernon Bank and Trust Company, Arlington, Virginia, since July, 1954, and 3100 North 10th street appeared on the bank's records as his business address. In this account with the bank there was almost daily activity, and at times considerable sums of money were deposited or withdrawn by Racine. The bank's branch manager, James T. Murphy, was acquainted with Racine, saw him frequently, and knew where Racine conducted his used car business.

On December 30, 1954, the bank financed a used 1954 Lincoln automobile for Racine which then bore dealer's license tags. This transaction was handled for the bank by Murphy, who inspected the automobile before approving the loan. The loan for $1,611.70 was payable in monthly installments and secured by a recorded lien on the certificate of title to the car, which was turned over by Racine to the bank. This 1954 Lincoln car was never delivered to the bank and Racine was allowed to retain possession and exercise complete dominion over it.

On January 12, 1955, Racine sold the 1954 Lincoln and paid off the loan held by the bank. On that day Murphy, acting for the bank, financed the 1952 Lincoln automobile, which also bore dealer's license tags. A loan of $1,050 was made to Racine and title certificate to the car, with the lien duly recorded thereon, was delivered to the bank as security. Section 46.1-71, Code 1950. The bank also obtained from Racine a note and chattel lien providing that the loan should be repaid in monthly installments of $70 each, but allowed Racine to retain possession of the car.

The title certificate to both Lincoln cars bore Racine's residence address, and the loan account was carried at his home address where he kept each of these cars at night during the time he owned them, but he drove them and left them on the lot at his place of business during the day. The evidence further shows that these two Lincoln automobiles were the only cars financed for Racine by the bank and that all the financing for the Racine Motor Company was done by the Atlantic Finance Company.

When plaintiff, accompanied by his wife, first saw this car on January 15, 1955, it bore dealer's license tags and was on the used car lot with fifteen or twenty other used cars. After seeing the car and discussing its purchase with Racine, plaintiff undertook to arrange his own financing in Washington, D. C. On January 17, 1955, he borrowed $1,020 from the Union Trust Company, Washington, D. C., by giving his note for $1,392. The Union Trust Company handed to him a sealed envelope containing a check and other papers and instructed him to deliver the envelope to Racine. Plaintiff contacted Racine and consummated the purchase of the car, which was then standing on the lot. In addition to the check of $1,020, which was in the sealed envelope, he endorsed and delivered to Racine the title to his Dodge car and paid $200 in cash.

Plaintiff was delivered a bill of sale to the automobile, which showed receipt of the foregoing items, totaling $1,595, and was told that title to the car would be sent to the Union Trust Company to be held by it until plaintiff's loan at that institution was paid. He was also told that it would be proper for him to drive the car for awhile with Racine's Virginia dealer's license tags, and he departed with the automobile.

On February 17, 1955, McQuay was advised that there was some question about the title and told to surrender the automobile to the Arlington County police department because it was needed as evi-

dence in criminal proceedings then pending against Racine who was charged with selling the car without a title. He delivered the car as directed, and on March 16, 1955, it was seized in a detinue action, to which McQuay was not a party, instituted by the bank against the Arlington county chief of police. Some weeks later the car was delivered to the bank, the action dismissed and plaintiff learned that the bank had obtained possession of the automobile. He made demand upon the bank for its return, which was refused, and thereafter he received a check for $150 from the bank without explanation. Upon inquiry he learned that the bank had obtained title to the car in its own name in September, 1955, sold it and retained possession of the proceeds with the exception of the $150 sent to him.

The trial court found that the bank did not know, nor was it charged with the knowledge that Racine was going to place the car in his shifting stock of used cars, or offer it for sale. In its finding of fact, stated in a brief opinion, the court said:

"The bank knew only that they were loaning money on a car owned by Racine and used by him personally. It might have been assumed by the bank that Mr. Racine would park his car on the lot. It would be strange if the bank did think he would not park the car on the lot. * * *"

Different inferences may be reasonably drawn from the evidence as to whether or not the bank's branch manager, Murphy, knew or should have known that the car would be placed by Racine with his other used cars and offered for sale. The court's finding of fact in that respect is justified and its decision has the force and effect of a jury's verdict. That being true, the principal question presented may be stated thus: Is a properly recorded lien on a second-hand automobile given by a dealer to a bank which left the car in the dealer's possession valid against a purchaser of the car from the dealer's premises for value and without actual notice of the lien?

Appellant relies upon the decision of *Boice* v. *Finance & Guaranty Corp.*, 127 Va. 563, 102 S. E. 591, 10 A. L. R. 654, wherein it is said:

"* * * Property bought for the express purpose of daily indiscriminate sale to the general public, exposed for such sale at the place of business of a licensed dealer, and over which the dealer is permitted to exercise the dominion of owner, cannot be made the subject of a valid chattel mortgage, regardless of its size, value or capacity for identification. The powers which the dealer is permitted

to exercise over the property in such case are inconsistent with a mortgage thereon.

\* \* \* \* \* \* \*

"\* \* \* [I]f the owner stands by and permits a seller, who is a licensed dealer in such goods to hold himself out to the world as owner, to treat the goods as his own, place them with other similar goods of his own in a public showroom, and offer the same indiscriminately with his own to the public, he will be estopped by his conduct from asserting his ownership against a purchaser for value without notice of his title. The constructive notice furnished by a recorded mortgage or deed of trust in such cases is not sufficient. The act of knowingly permitting the goods to be so handled and used by the seller in the ordinary and usual conduct of his business is just as destructive of the rights of the creditor as if such permission had been expressly granted in the martgage or deed of trust." (At pages 569, 570.)

Of like effect are *O'Neil* v. *Cheatwood*, 127 Va. 96, 102 S. E. 596; and *Garrett* v. *Rahily & Martin*, 132 Va. 226, 111 S. E. 110.

In *Gump Investment Co.* v. *Jackson*, 142 Va. 190, 128 S. E. 506, 47 A. L. R. 82, the car in question, a new Dodge coupe, was sold by the dealer Kite Company, Inc., to Mrs. R. T. Sutton whose husband was employed by Kite as a salesman. The dealer was allowed to keep possession of the automobile, and it was left on display in the sales room along with other cars that were for sale. Gump Investment Co., which was engaged in the business of financing automobiles, purchased from Kite, the dealer, the duly recorded reservation of title contract, along with the notes for the deferred purchase price executed by Mrs. Sutton, without knowing that the dealer had retained possession of the car or that the transaction was not *bona fide*, it being assumed by Gump that the car had been sold and delivered to Mrs. Sutton. Subsequently Jackson saw the car in the sales room and purchased it from Kite Co., Inc., for value and without actual knowledge of the existence of the lien. The issue presented was whether the lien held by Gump Investment Company was paramount to the rights of Jackson, the purchaser. In deciding that Jackson, who purchased the car for value from the dealer's sales room, was entitled to prevail, the court said:

"It would, of course, follow that the leading principle upon which

the *Boice Case, supra,* rests is inapplicable here, because the Gump Company had no knowledge that the Kite Company had retained the car in its possession and under its control. On the contrary, as far as it was advised, it had been sold and delivered to Mrs. Sutton. But there are certain conclusions which inevitably arise from and grow out of the *Boice Case* which, we think, control the instant case.

"One conclusion is that some duty, at least, rests upon an individual, corporate or otherwise, who finances a retail dealer, to see to it that cars upon which he has a lien are not left under the domain and control of such dealer on his sales room floor, to be offered to the public. The business of the Gump Investment Company was to finance retail automobile dealers, and it did finance them for a profit. It assumed some risk both as to the moral and financial standing of every dealer it financed. It took a risk as to the hazard for a profit. This is the status of the Gump Investment Company in this case." (At pages 194, 195.)

In the more recent case of *General Credit, Inc.* v. *Winchester Inc., et al.,* 196 Va. 711, 85 S. E. 2d 201, the Virginia decisions upon this subject are collected and discussed, along with other authorities. There Winchester, Inc., had been an authorized Packard automobile dealer for several years; it was also engaged in buying and selling used cars at its place of business and showrooms. For several years General Credit had assisted Winchester in financing the purchase of new cars by advancing the purchase price to Packard Motor Company and taking liens on the automobiles to secure the sums so loaned. After the cars came into the possession of Winchester, it would secure a dealer's certificate of title issued in Winchester's name for each car from the Division of Motor Vehicles. Section 46.1-117, Code 1950, (formerly § 46-106). Each certificate of title disclosed the lien in favor of General Credit for the amount of the purchase price advanced by the latter, and the certificate was held by General Credit until its lien was paid. Section 46.1-69, *et seq.,* Code 1950.

Winchester, with the permission of General Credit, placed the cars on display in its show room for sale to the public and General Credit relied upon Winchester to collect the purchase price when a car was sold and pay off the recorded lien. About once or twice a week General Credit would check the number of cars with Winchester on which it held liens, ascertain what cars had been sold to purchasers and require Winchester to pay off the liens. Upon

discharge of the liens, certificates of titles to the cars would be transferred to the names of the respective purchasers. It thus appears that General Credit knew that automobiles on which it held recorded liens were offered for sale by Winchester from its shifting stock of cars and that the cars were actually being sold by Winchester to its customers before the liens had been paid. It fully acquiesced in this mode of operation.

On May 7, 1953, General Credit advanced to Packard Motor Company $2,499.26 on Winchester's account for the purchase of the Packard sedan in question. On May 22, 1953, the Division of Motor Vehicles issued a dealer's title certificate for that car, showing the lien thereon of $2,499.26 in favor of General Credit, and the title was delivered to the latter company. Winchester had, in the meantime, taken possession of the car and exhibited it for sale in its show room. On May 23 Baker and Bermudez purchased the car from the show room without being advised that General Credit held a recorded lien thereon, but were told that they would receive a title certificate from the Division of Motor Vehicles in a few days.

Winchester failed to pay off the lien held by General Credit, and on June 1st, as a result of its routine check, General Credit ascertained that the car had been sold to Baker and Bermudez. In holding that Baker and Bermudez were entitled to the car free of General Credit's lien, the decision in the *Boice* case and the principles there announced were adhered to and approved. Mr. Justice Eggleston, now Chief Justice, said:

"We agree with the trial court that under the principles laid down in *Boice* v. *Finance & Guaranty Corp.*, 127 Va. 563, 102 S. E. 591, 10 A. L. R. 654, the lien of General Credit was null and void as against the rights of Baker and Bermudez who were purchasers for value and without actual notice of the existing lien." (At page 714.)

The scope of the holding and the legal effect of the decision in the *Boice* case are pointedly stated in the following language:

"In the *Boice* case, decided in 1920, this court held that a duly recorded chattel mortgage, executed and delivered by an automobile dealer on an automobile forming a part of his stock of cars *and left with the dealer for sale with the knowledge and consent of the lien holder*, was null and void as against a purchaser for value without actual notice of the existence of the lien." (At page 714.) (Emphasis added.)

We adhere to and approve the principle as stated. However, inso-

far as the opinion in *Gump Investment Co.* v. *Jackson, supra,* extends the principle announced in *Boice* v. *Finance and Guaranty Corp., supra,* and adhered to in *General Credit, Inc.* v. *Winchester, Inc., et al., supra,* it is modified and overruled.

Here the trial court concluded from the evidence that the bank did not know, nor was it charged with notice that Racine would place the automobile on which it held a lien in his stock of cars for sale. The evidence being sufficient to sustain the finding, the judgment is accordingly affirmed.

*Affirmed.*