**BANK OF HAWAII, Plaintiff,**

**v.**

**GEORGE NERU, GENERAL REPAIRS, INC., and AMERICAN SAMOA GOVERNMENT, jointly and severally, Defendants.**

High Court of American Samoa
Trial Division

CA No. 65-96

April 3, 1997

Before RICHMOND, Associate Justice, VAIVAO, Associate Judge, and ATIULAGI, Associate Justice.

Counsel: For Plaintiff, Jennifer L. Joneson
 For Defendants George Neru and General Repairs, Inc., *Pro Se*
 For Defendant American Samoa Government, Cheryl A.
 Crenwelge, Assistant Attorney General

Initially, plaintiff Bank of Hawaii ("BOH") filed this action to recover the unpaid principal balance, interest, attorney's fees and costs on a promissory note executed by defendant General Repairs, Inc. ("General Repairs"), secured by a chattel mortgage in two 1995 Chevrolet mini buses (respectively "bus #1" and "bus #2"), and guaranteed by defendant George Neru ("Neru"). Later, BOH filed an amended complaint to additionally set aside the conveyances of both buses by General Repairs and Neru to defendant American Samoa Government ("ASG"), recover possession of the buses from ASG, and enforce the security agreement.

On November 13, 1996, the court entered a default judgment in BOH's favor against General Repairs and Neru for $45,509.12, including prejudgment interest of $5,398.52, post-judgment interest at the rate of 11.75% per year, and an as yet undetermined amount of attorney's fees and costs. The cause of action against ASG came regularly for trial on January 31, 1997, with both counsel and Neru present.

### Facts

On November 16, 1994, ASG issued a "Solicitation for Bids," No. 571-95, to procure a 1995 Chevrolet mini bus. On February 7, 1995, ASG, using this solicitation, awarded General Repairs contracts for the purchase of bus #1 for ASG's Special Education program, Purchase Order No. P50186, and bus #2 for its Vocational Rehabilitation program, Purchase Order P50188.

ASG paid General Repairs $16,726.50 of the contract price for bus #1 on or about March 6, 1995, and the balance of $31,063.50 on or about July 14, 1995. A-Z Bus Sales, Inc. ("A-Z Sales") invoiced bus #1 to General Repairs on May 8, 1995, and shipped the bus from California on a South Seas Steamship Co. Inc. ("South Seas Steamship") vessel. Bus #1 arrived in American Samoa on or about September 6, 1995, under a bill of lading, dated June 8, 1995, designating "American Samoa Government c/o General Repairs" as the consignee. Bus #1 was released to ASG, without assessment of any import excise tax.

ASG paid General Repairs $16,027 of the contract price for bus #2 on or about March 17, 1995, and the balance of $29,763 on or about May 15, 1995. A-Z Sales also invoiced bus #2 to General Repairs on May 8, 1995. However, A-Z Sales actually shipped a 1996 Chevrolet mini bus ("bus #3"), in lieu of bus #2, from California on a South Seas Steamship vessel. Bus #3 arrived in American Samoa on or about September 16, 1996, under a bill of lading, dated August 29, 1996, designating "American Samoa Government Department of Education" as the consignee. Bus #3 was also released to ASG, without assessment of any import excise tax.

On May 26, 1995, BOH loaned General Repairs $70,000, payable in full on August 24, 1995. On the same date, Neru, as president of General Repairs, signed a Security Agreement/Chattel Mortgage ("security agreement") providing BOH security for the repayment of the loan. The security agreement granted a security interest in, among other things, bus #1 and bus #2. General Repair failed to pay off the loan on time and BOH extended the due date to November 13, 1995. Then, on December 29, 1995, when General Repairs still had not fully paid the loan, BOH and General Repairs refinanced the loan, with a new due date of March 31, 1996.

On May 12, 1996, after General Repairs failed to pay the refinanced loan, BOH notified ASG that General Repairs was not permitted to transfer BOH's security, bus #1 and bus #2, without BOH's consent and that BOH did not consent to the transfer of the buses to ASG. On July 3, 1996, ASG responded by denying that General Repairs had ever held title to the Vehicles and thus could not have granted a security interest in them.

On August 1, 1996, BOH requested that ASG relinquish bus #1 and stated that BOH intended to take possession of bus #2 upon its arrival in September 1996. On August 1, 1996, BOH also notified General Repairs and Neru that it demanded delivery of bus #2 upon its arrival in American Samoa. ASG presently retains possession of both bus #1 and the replacement bus #3.

ASG has procured buses and vans from General Repairs in the past. A partial list includes three buses and two vans in 1994. However, neither General Repairs nor Neru is licensed as a dealer of any kind of vehicles, and neither offers buses for sale to the general public.

BOH asserts a security interest in both bus #1 and bus #3 and wishes to foreclose on that interest. ASG asserts that it owns both buses free from BOH's claims.

54

## Discussion

█ In American Samoa secured transactions are governed by the common law except where those principles have been modified by statute or are otherwise inappropriate to local conditions. *Dev. Bank of American Samoa v. Reed*, 5 A.S.R.2d 135 (Trial Div. 1987).

█ A.S.C.A. § 27.1510 dictates when a chattel mortgage is valid:

No mortgage, bill of sale, conditional sales contract, deed of trust or conveyance or personal property which is not accompanied by a permanent delivery thereof to the vendee is valid as to persons who do not have actual knowledge thereof unless all of the following conditions are met:
(1) it is in writing signed by the person to be bound and attested to by at least one witness;
(2) it is filed with the territorial registrar within 10 days after its execution;
(3) it truly states the consideration upon which it was based or the debt or liability which it was intended to secure, and contains a description of the specific article, articles, or land sold or mortgaged.

█ Of course, one cannot grant a chattel mortgage or security interest in property without first having some rights in that property. Here the parties disagree as to whether General Repairs or Neru ever had any property interest in any of the buses at issue.

The resolution of this question depends largely on when and to whom A-Z Sales transferred title to the buses. A-Z Sales' invoices state that General Repairs is the customer to whom the buses were sold. However, this alone does not dictate when and to whom the title attached.

Under the common law, title passes as soon as the bargain is struck. *See* J.W. Ehrlich, *Ehrlich's Blackstone*, 395 (Nourse Publishing Co. 1959). Thus, under the common law, General Repairs would have had title to both vehicles on May 8, 1995, the dates of the invoices and the apparent date when the "bargain was struck." However, it appears that, under this rule, ASG acquired title to bus #1 and bus #2 on February 7, 1995, when it accepted General Repairs bid and rendered purchase orders P50186 and P50188. Thus, when the common law is applied to the situation at bar it appears that ASG acquired title from General Repairs before General Repairs could have acquired title from A-Z Sales. Obviously, General Repairs could not possibly transfer a title which it did not have.

█ Instead of speculating on how the common law might deal with such a situation, however, we find it more appropriate to determine that this is one

55

of those instances in which the common law is inapplicable to present conditions. The short passage from *Erlich's Blackstone* on this issue did not, and could not, properly address the transfer of title in complicated sales contracts. In Blackstone's time sales contracts were simple.[1] Contracts did not deal with delivery to foreign lands or installment sales or purchase orders. As such, we believe that this common law principle is ill suited for determining when the transfer of title occurs in today's sophisticated global economy.

■ Although the common law does not adequately address the issue of title transfer in the modern context, the Uniform Commercial Code ("UCC") does. Under UCC § 2-401(2) it is clear that:

> (2) . . . title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading
> (a) if the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; but
> (b) if the contract requires delivery at destination, title passes on tender there.

■ Although the UCC has not been adopted in American Samoa,[2] we believe its wisdom on this subject is reasonable, especially in light of inappropriate applicability of the common law. From the evidence, it appears that the contract between General Repairs and A-Z Sales required A-Z Sales to ship the buses but did not require delivery at destination.[3] Therefore, title transferred from A-Z Sales to General Repairs, upon A-Z

---

[1] Indeed in his discussion of title transfer, Blackstone uses an example of a sale of a horse for ten pounds. This common law principle was meant to apply to such simple sales. *See* J.W. Ehrlich, *Ehrlich's Blackstone*, 395.

[2] The UCC has, however, been adopted in every state save Louisiana. In addition, the UCC has also been adopted in the District of Columbia and in territory of the Virgin Islands. 67 Am. Jur. 2d, *Sales* 1.

[3] We note that there is a strong presumption against the creation of destination contracts and in the absence of a contract term or trade usage to the contrary, a contract which contemplates the transportation of goods from the seller to the buyer will be interpreted as a shipment contract and not as a destination contract. 67 Am. Jur. 2d, *Sales* 393.

Sales' tender of the buses to South Seas Steamship. This occurred on June 8, 1995, for bus #1 and on August 29, 1996, for bus #3.

Thus, prior to their arrival in American Samoa, and after the signing of the security agreement, bus #1 and bus #2, described in the security agreement and in the A-Z Sales invoices, were owned by General Repairs. As such the security agreement was valid, *ab initio,* to those buses as described. The question then turns on whether the security agreement is valid as to bus #1 and bus #3 now in ASG's possession and, if initially valid as to these buses, whether subsequent events have invalidated BOH's security interests.

I. Bus #1

Bus #1 is without question the same bus described in the security agreement. It is the same year, make and model and has the exact same VIN number. As such, BOH's security interest in bus #1 had vested upon its arrival to American Samoa. Thus, when the title passed from General Repairs to ASG (upon delivery to ASG by General Repairs), that title was encumbered by BOH's security interest. Although ASG asserts that it had no actual knowledge of the security agreement, the security agreement was filed pursuant to A.S.C.A. § 27.1510 and, thus, ASG has constructive knowledge of BOH's non-possessory lien against bus #1.

A. Buyer in Ordinary Course

ASG, however, argues that it is a buyer in the ordinary course and should not have constructive knowledge imputed to it. We disagree. First, the "buyer in the ordinary course" doctrine was not available, as such, at common law. Rather there were common law cases which recognized that a mortgage on a stock of goods, wares, and merchandise was void as to purchasers of such goods. *See e.g. Boice v. Finance & Guaranty Corp.,* 127 Va. 563, 102 S.E. 591 (1920). This common law approach was not truly a "buyer in the ordinary course" rule but rather was based on the principle of equitable estoppel, which we will address separately below.

■ The "buyer in the ordinary course" doctrine was a label used by the UCC in an attempt to organize and codify these common law principles. UCC § 1-201(9) defines a buyer in the ordinary course of business as a person who:

> in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in goods buys in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker.

57

UCC § 9-307(1) goes on to state:

> A buyer in ordinary course of business . . . takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer know of its existence.

These UCC provisions make good commercial sense when, for example, a dealer or retailer collateralizes inventory for credit purposes. Thus, under the UCC, if we were to determine that General Repairs was in the business of selling buses, ASG would have taken both bus #1 and bus #3 free and clear, even with actual knowledge of BOH's security interest. We, however, do not believe that the evidence suggests that General Repairs or Neru was in the business of selling buses. Neither General Repairs nor Neru is a licensed bus dealer. More important, they do not hold themselves out to the general public as bus dealers. The present and past transactions are occasional, occurring only when ASG periodically procures buses and vans. As such, even if this court were to apply the UCC's rule regarding "buyers in the ordinary course," we do not find that General Repairs or Neru is "in the business of selling" buses.

B. Equitable Estoppel or Laches

As discussed above, the common law recognized a quasi-buyer in the ordinary course doctrine. ASG argues that the common law rule of equitable estoppel should be applied in this circumstance. ASG's argument is based on BOH's failure to assert it rights to bus #1 until well after BOH knew that ASG had gained title and possession of bus #1. We believe that *Tumber v. Automation Design & Mfg. Corp*, 324 A.2d 602 (1974) is closely on point with the case at bar.

In *Tumber* an owner entrusted a machine to a corporation under a lease agreement which was never completed. The owner acquiesced to the use of machines by two others and the machines were later purchased by another corporation. A couple years later the original owner demanded the machines. The court held that the original owner was the one who made the wrongful sale possible and should bear the loss by being estopped from asserting title. In the case at bar, BOH knew that bus #1 was going to be sold and delivered to ASG, in violation of the security agreement. Bus #1 arrived in American Samoa on or about September 6, 1995 and was immediately delivered to ASG. BOH waited until May 12, 1996, to assert any interest in bus #1. BOH knew at the signing of the security agreement that ASG was the end purchaser of bus #1, yet waited until over eight months after ASG took possession and title to bus #1 to assert its interest. We believe that BOH's actions as to this bus were unreasonable and that it

58

should bear the loss by being estopped from asserting its security interest in bus #1.

II. Bus #3

Bus #2, the vehicle specifically in the security agreement, and bus #3, the vehicle that actually arrived in American Samoa, are different vehicles. ASG argues that since bus #2 and bus #3 are not the same vehicle, the security agreement does not cover bus #3.

█ As stated above, A.S.C.A. § 27.1510 dictates when a chattel mortgage is valid. The description requirements set forth in subsections (1)-(3) only apply to "persons who do not have actual knowledge thereof." Both General Repairs and ASG had actual knowledge of BOH's security in two buses. Two buses are described in the security agreement, were sold to General Repairs by A-Z Sales, and arrived on island. Regardless of their model years and VIN numbers, all parties knew that these buses were the buses to be covered by the security agreement.[4] Specifically, ASG knew of this security interest before it took title and possession of bus #3 in place of bus #2. As such, we find that BOH has a valid security interest in bus #3.

Therefore, since the equitable considerations discussed as to bus #1 are not applicable to bus #3, we find that BOH has an enforceable security interest in bus #3.

## Conclusion

General Repairs owned bus #1 and bus #3. BOH had a security interest in both of those vehicles, which attached prior to General Repair's transfer of title to ASG. As to bus #1, we find that BOH is estopped from asserting its security interest. As to bus #3, we find BOH's security interest is valid and enforceable and order foreclosure of that security interest. General Repairs' transfer of bus #3 to ASG is set aside, and ASG must surrender possession of bus #3 to BOH.

It is so Ordered.

---

[4] Even the A-Z Sales invoice indicated bus #2 was the bus being shipped to General Repairs.