G. H. HAMMOND COMPANY v. JOSEPH MERCANTILE
COMPANY.

Opinion delivered May 23, 1921.

PRINCIPAL AND AGENT—APPARENT AUTHORITY OF AGENT.—To the general rule that no man can get a title to personal property from a person who himself has no title to it, there is an exception where the owner has conferred upon the seller the apparent right of property as owner or for disposal as his agent.

Appeal from Greene Circuit Court, First Division; *R. H. Dudley*, Judge; affirmed.

*D. G. Beauchamp*, for appellant.

1. The giving of instruction 6 was prejudicial error. It was abstract and not based upon any evidence. There is no evidence that Perkins sold the meat to defendant company in accordance with any custom of the trade and usual course of business conducted by Perkins or others engaged in that line of business at Paragould and shown to plaintiff company.

The instruction is erroneous in that it ignores the powers and limitations placed upon Perkins by the plaintiff company under the contract.

2. Appellee was estopped. Under the contract Perkins could not pass a good title to defendant. 97 Ark. 43-9; 33 *Id.* 465; 48 *Id.* 426; 82 *Id.* 367. Any statements made by Perkins to defendant company, or any acts of Perkins with defendant company concerning his dealing could not bind appellant. All such statements and acts were *res inter alios actae* as to appellant. 97 Ark. 43-49.

3. Instruction No. 6 is indefinite and uncertain. Taking the entire record and all the evidence in the case, there is no theory upon which can be based an instruction that would authorize the jury to find for the defendant and a verdict should have been instructed for plaintiff. 222 S. W. 27-8. The former appeal settles the law of this case, and it was error to give instruction No. 6.

4. On the question of estoppel, see 36 Ark. 96; 80 *Id.* 404; 82 *Id.* 367; 97 *Id.* 43; 89 *Id.* 394; Ann. Cas. 1914 B 984.

5. On question of innocent purchaser, see 42 Ark. 373; 47 *Id.* 363; 48 *Id.* 160; 49 *Id.* 63; 54 *Id.* 305; 44 *Id.* 210; 7 Pa. Co. Ct. 637; 32 Ill. 411; 167 Ala. 109; 3 Am. Dec. 740; 80 N. C. 275; 56 Minn. 244; 53 W. Va. 415.

*Huddleston, Fuhr & Futrell*, for appellee.

The question is not, "What was the authority actually given to Perkins?" but is, "'What was the party dealing with Perkins justified in believing?" The authority of the agent must depend, so far as it involves the rights of innocent third persons who have relied thereon, *upon the character bestowed rather than the instructions given.* The principal is bound to third persons, acting in ignorance of any limitations, by the apparent authority given and not by the express authority. 5 Atl. 504; 75 Ill. 426; 56 *Id.* 23; 79 Mich. 516; 44 N. W. 942. Whatever attributes properly belong to the *character bestowed* will be presumed to exist, and they can not be cut off by private instructions of which those who deal with the agent are ignorant. Among those attributes is the power to do all that is usual and necessary to accomplish the object for which the agency was created. 54 N. W. 50.

Parties dealing with an agent have a right to presume that his agency is general and not limited. 33 Me. 169; 78 *Id.* 160; 3 Atl. Rep. 185. The presumption is that one known to be an agent is acting within the limits or scope of his authority. 79 Mich. 516; 44 N. W. 942.

The customs and usages of business are silently adopted in to the contract. Story on Bailments, § 384. One who is engaged in a trade or business is bound to know its usages at the place where he acts and is presumed to have contracted with reference to them. 13 Wall. 363; 49 N. Y. 464; 21 N. E. 160; 46 N. Y. 325.

The plea of the contract means the place of its making unless its terms indicate another place of performance. 78 N. W. 562.

No negligence can be charged to appellee, and where, as between two innocent parties, the title of the one or the other must be lost the misfortune must rest upon the

one who designedly or by negligence has placed some third person in such apparent control of the title as to enable him to perpetrate a fraud upon the other, if that other be deprived of the title.   42 Ark. 473.   See, also, 20 Wend. 278; 128 Ark. 600; 137 *Id.* 475; 48 *Id.* 147; 46 *Id.* 210; Story on Agency (8 ed.), § 127; 96 U. S. 84. There was no error in sending the case to the jury, and the verdict is amply supported by the evidence.

WOOD, J.   The appellant, a corporation of the State of Michigan and doing business in Arkansas, entered into a contract with one Ray Perkins of Paragould, Arkansas, the material parts of which are as follows:

The appellant appointed Perkins its broker for the sale of certain of its products in Paragould, Arkansas. The appellant was to pay Perkins a commission for his services.   Perkins was to keep an account of goods consigned to him by the appellant in books furnished by the latter, which were subject to recall and inspection by the appellant at all times.   Perkins was to make weekly reports of the stock on hand and delivery of goods on blanks furnished by appellant.   Perkins was to sell the goods on behalf of appellant and on terms prescribed by the appellant.   Perkins was to bill no goods from consigned stock to himself under any circumstances. Perkins was to bill all goods on blanks furnished by the appellant and to forward a duplicate thereof to appellant on the day the goods were delivered.   He was to keep the receipts for goods delivered on file subject to the order of the appellant.   He was not to handle on consignment any packing house products except appellant's with appellant's consent.   Perkins was to account to appellant for all weights shipped.   He was to keep all goods in a suitable building and not mingle them with other merchandise and to sell and handle the same without expense to the appellant except his commission.

This action was brought by the appellant against the appellee to recover the sum of $308.10.  The appellant alleged that the appellee had taken possession of 1,165

pounds of bacon extras which belonged to the appellant, and that appellee had converted the same to its own use without authority of appellant. This is the second appeal in this case. The complaint remained the same on both trials. On the first trial, the answer to the complaint set up that Perkins was in the employ of the appellant as a factor and in possession of its products with full power and authority to sell, deliver, and collect for appellant's products, either in his own name or in the name of appellant; that appellee purchased the meat in controversy from Perkins as his individual property; that he represented to the appellee that it was his property, being the accumulation of what was known as "overs," and was billed out to the appellee as the individual property of Perkins and paid for by the appellee as such; that the appellee in purchasing the meat from Perkins followed the custom and course of trade which had prevailed at Paragould for many years and was well known to the appellant; that the appellee believed that the meat was the individual property of Perkins and had no knowledge to the contrary.

The issue as thus raised on the first trial was sent to the jury, and in one of its instructions the court declared as follows: "If the plaintiff authorized and knowingly permitted its factor, Perkins, to sell overs or any other of its goods, or his own goods, on his individual account as individual owner to customers, * * * and the defendant at the time believed Perkins to be the true owner, or authorized to sell in his own name, then you will find for the defendant." In passing on this instruction, this court explained the difference between factor and broker as follows: "A factor may buy and sell in his own name, and he has the goods in his possession, while a broker as such can not ordinarily buy or sell in his own name and has no possession of the goods sold."

In passing on the facts as developed at the former trial, we said: "Perkins was not a factor or commission merchant and had no right to sell the products of the

plaintiff in his own name. Therefore, the court erred in assuming to the jury that Perkins was a factor and in telling the jury to find for the defendant if it should further find that the plaintiff authorized or knowingly permitted its factor, Perkins, to sell overs or any of its goods, or his own goods, on his individual account.'' For the error in giving the above instruction the court reversed the judgment and remanded the cause for a new trial.

On the second trial the appellee filed an amended answer in which it alleged that Perkins was an independant dealer in meat products in Paragould, Arkansas, and was conducting his individual business in connection with that of the plaintiff; that he combined his own and the plaintiff's business in this way to such an extent that his customers could not tell whether they were dealing with him individually or as the agent of the plaintiff; that the plaintiff knew, or should by the exercise of reasonable prudence and care have known, that Perkins was conducting his own individual business in conjunction with the plaintiff's business; that the defendant, acting in good faith and ignorant of plaintiff's alleged interest in said meat, purchased the same according to the custom of trade and paid Perkins for the same, honestly and in good faith believing Perkins to be the true owner thereof, and that plaintiff company is, therefore, estopped from now claiming payment from the defendant.

On the issue thus joined at the last trial, the president of the appellee testified substantially as follows: He had been in business at Paragould, Arkansas, for about fifteen years. The day appellee purchased the meat, Perkins came in and said he had some meat that he would sell to the appellee a quarter of a cent under the market price. Witness purchased it of him and paid for it. He had traded with Perkins and his father for fifteen years and had bought meat from them quite a number of times as their individual property. No question ever came up before, and nothing had happened to arouse his suspi-

cion that the meat was not Perkins'. Witness knew that Perkins was the broker of the appellant to sell its meat products, and that he had no right to sell appellant's goods as his own individual goods, but he did not sell the meat in controversy as the goods of appellant. Witness did not know anything about the contract between Perkins and the appellant. Witness knew that nobody had a right to sell goods belonging to some one else without authority. Witness didn't know that this meat was the property of appellant. Perkins might have bought it from some one else so far as he knew. He supposed that the goods were shipped by the appellant to Perkins. Appellant had done nothing at any time or said anything that would lead witness to believe that the goods were purchased. He trusted Perkins' word that the goods were his. The products that the appellee bought from Perkins were paid for for sometimes in cash and sometimes by check. The checks were made payable sometimes to Perkins and sometimes to the appellant. Witness never heard any kick on this. Witness bought the goods from Perkins and not from the Hammond Company. When he bought goods from Perkins that were billed by the Hammond Company, he paid the Hammond Company for them. The only time he gave Perkins checks in his own name was when he owned the stuff himself. Witness didn't know whether the appellant had any knowledge or information of the individual transactions he had with Perkins or not.

The secretary of the appellee testified that he had been in charge of the office and book affairs of the appellee for about twenty years. During this time appellee had been doing business with Ray Perkins and his father. Witness knew nothing about the contract between appellant and Perkins—made no inquiry about it. Witness knew that the appellee bought the meat in question from Ray Perkins individually and paid for it. Witness had nothing to put him on inquiry that the meat did not belong to Perkins. He would not have bought it if he had known it was Hammond's. Witness knew that Per-

kins had no right to sell Hammond Company meat as his own and in his own name. The accounts that the appellee paid Perkins in his own name were for goods that Perkins claimed were his own and sold as his own. Witness didn't remember how many companies Perkins might have represented. No question ever came up about the purchase of meat. He did not know whether under the contract Perkins had the right to sell the meat in his own name—never saw the contract. Perkins said he was selling his own meat.

Other witnesses testified substantially to the effect that they had bought packing house products from Perkins for several years. One witness stated that he had bought meat from Perkins in the name of the Hammond Company. Sometimes Perkins would bill it out to witness in his individual name in average amounts from $75 to $700. Witness had transactions directly with the Hammond Company. They would often send him a statement for comparison. Perkins always protected witness against all advances. Witness would make remittances to Perkins. All checks for individual purchases would be made direct to him.

Another witness stated that he had bought quite a large quantity from Perkins—had had transactions for the Bertig Brothers with Perkins in which Perkins sold Bertig Brothers meat as his individual property. It did not occur often, and no question was raised about it.

Another witness testified that for thirteen years he had bought stuff from Perkins. He would mail checks to both Perkins and the appellant. No question was ever raised. Toward the latter part of his business witness thought Perkins was selling meat on a commission, but never gave it any thought. Witness had bought meat from Perkins as his own product and would usually pay Perkins individually when he purchased it from him that way, and there was never any complaint on the part of the appellant. Witness did not know whether they ever knew about it or not.

Another witness stated that for fifteen years he had bought meat from Perkins. He did not know whether he traded with them as individuals or as the agents of the Hammond Company. He would buy stuff from them, and they would send around and collect for it, and he would make the checks payable to Perkins. Witness "thought Ray Perkins was the whole cheese—didn't know any difference."

Ray Perkins testified for the appellee to the effect that he dealt in meats and lards on his own account; that he sold in his own name to a large extent to appellee and other merchants who handled the goods sold by him. These merchants were his customers in buying his individual goods and also the Hammond goods. He would sell them Hammond goods as Hammond's agent and sometimes as his individual goods and collect for them individually. Customers paid sometimes in checks to the Hammond Company and sometimes to witness individually. Witness would get the money and account to the Hammond Company for their part of it and keep his part. There was never any objection by the appellant to this method of conducting the business. Question never arose. Goods billed out to purchasers along the railroad would be billed in the Hammond Company name when that company sold the goods. If Perkins sold the goods, it would be billed out in Perkins' name. Perkins transacted considerable business with the defendant company; sold them goods as his individual property. Witness never had any understanding with the Hammond Company about overs—no written contract. He was in Chicago talking to the head of the concern, and the subject of shrinkage came up, and the manager told witness that he would be satisfied to receive the weights they shipped Perkins, and in any case where it would happen to be one-half of one per cent. less than they shipped Perkins it would be all right, and he said, "If anything else occurs, you know how to take care of it, I guess." Witness assumed that he meant if the meat ran over

witness was supposed to take it, and he did. Witness would accumulate stock of his own in this way with "overs." When witness considered the market right, he would instruct his employee to weigh up one or two thousand pounds of meat and put it over on witness' side of the warehouse and go to his book and charge it to Bertig Brothers at the best market price on that day and pay the money on that invoice and remit it to Chicago, and report the sale as having been made to Bertig Brothers. Witness transacted the business in that way because appellant company would not allow witness to bill anything to himself. The bills that were billed in that way were never presented to Bertig Brothers—were not intended to be. Witness paid the company the market price for the stuff he got.

On cross-examination witness stated, among other things, that the contract under which he was employed by the appellant reflected his authority, and the same had not been changed. Only the manager of plaintiff said "occasionally there are 'overs,' and if there are 'overs' you know what to do with them," and witness took it for granted that witness might appropriate the "overs" to his own use. The meat that was sold to the defendant belonged to the Hammond Company. The defendant wanted bacon extras. Witness didn't have it, but did have dry salt extras, and he told his employee to take the dry salt extras out of his pile and take and put them in place of the bacon extras and take the bacon extras and deliver them to the defendant company; that was the only claim witness had to the meat sold the defendant. The Hammond Company was never advised about the transaction and was never paid for it. The meat was delivered to the defendant in the original packages as received from the Hammond Company. Witness was a merchandise broker and a manufacturer's agent. He handled meat and lard for the appellant and also bought from the Hammond Company and sold it on his own hook. Witness also handled oil and gasoline and sold

it as the agent of the company who owned it. Witness had no authority to buy from the Hammond Company in his own name. Appellant had no information, so far as witness knew, that witness was handling appellant's goods in his own name, or that he was handling the goods of any one else in his own name. When appellant's auditors would come to check up witness, whatever witness owned himself he would put out to one side of the house out of the way and take some lard and pack it around in various places, and hauled some to the oil house so that appellant's auditor couldn't discover it.

Another witness, an agent in the employ of Perkins since July 6, 1906, testified that any time the auditor came to audit the books and discovered any extra stock he would be told that that was sold and didn't belong to the stock. After the contract between Perkins and the appellant was executed on July 10, 1917, up to May 7, 1918, if Perkins was engaged in any other business of any kind except representing the plaintiff and an oil company, it was so slight that witness could not remember it. Witness sometimes made collections for Perkins including oil and other things. If the company had any knowledge of any of the transactions, witness didn't know it. These transactions detailed by the witness did not appear on the record. The witness further testified, "Mr. Taylor told us to sell one kind of meat and bill it out as another kind. It would be sold as the company's meat."

Witness Taylor testified that he had been working for the appellant company for about fifteen years. He visited Paragould at irregular intervals of about six weeks; had appellant's business at Paragould under his immediate control as inspector. He did not discover that Perkins was buying goods on his own account or selling them. During all the time he never found any meat or products in Perkins' house that Perkins claimed as his own. He had no information that Perkins was selling appellant's goods in appellant's name and collecting for

them in his own name. He had no information that Perkins was billing out goods and not delivering them. The company had no information of any of these things, so far as witness knew. Witness was familiar with Perkins' books, and in examining the books and the business nothing ever occurred, nor did witness ever discover anything, irregular. Witness never made a complete audit of Perkins' books. If there were any discrepancies, he checked them up.

The court gave instructions correctly defining the issues and interpreting the contract between the appellant and Perkins, and told the jury, among other things, that the undisputed evidence showed that the title to the meat in question was in the appellant and that the possession and sale of it by Perkins as his own would not give the appellee good title to it. The court also told the jury that if the appellee knew that Perkins was the agent or broker of the appellant when it bought the meat from him he was acting as such in the sale of the meat, they should find for the appellant. The court further instructed the jury as follows:

"But, if you find from the evidence in the case that the plaintiff by its manner and course of conduct and dealings with its agent, Perkins, and through him with the public; and plaintiff by its own voluntary acts or consent gave to, or knowingly permitted, said Perkins to sell its goods as his own; and, if you further find from the evidence that the said Perkins sold the meat in question to the defendant company in accordance with the custom of the trade and usual course of business as conducted by Perkins, or others engaged in that line of business at Paragould, and known to plaintiff company; and if you further find from the evidence that the defendant company, acting in good faith, and in ignorance of the fact that plaintiff owned the meat, and in the exercise of such care as an ordinarily prudent person would use under like circumstances, bought the meat in question, believing it to be the property of said Perkins, then you

will find for the defendant; but, unless you do so find, then you will find for the plaintiff."

The appellant duly excepted to the ruling of the court in giving instruction No. 6. The verdict and judgment were in favor of the appellee. The appellant seeks to reverse the judgment, and concedes that the only question is as to whether or not the court erred in giving instruction No. 6.

On the first trial the issue was submitted on the theory that the undisputed evidence showed that Perkins was the factor of the appellant. This court held on the former trial that the trial court erred in instructing the jury that Perkins was the factor of the appellant. On the last trial, as shown by the present record, the court avoided that error, and the cause was submitted upon the theory that, although Perkins was the broker or agent of the appellant for the purpose of selling its meat products at Paragould, yet, if the appellant by its conduct knowingly permitted Perkins to sell its goods claiming them as his own in pursuance of a custom or course of dealing which he had established at Paragould of which appellant had knowledge, and the appellee, in good faith and in the exercise of ordinary care, purchased the meat from Perkins believeing it to be his property, the verdict should be in favor of the appellee.

The testimony speaks for itself, and we are convinced that it is sufficient to have warranted the court in presenting the cause to the jury upon the theory which the court did in its instruction No. 6. The testimony is voluminous, and it could serve no useful purpose to discuss it in detail. After a careful consideration of it, we have reached the conclusion that it can not be said as a matter of law that there was no testimony to warrant the instruction and to justify the verdict. The case on the facts as developed at the last trial is ruled by the principle announced by this court in *Rogers* v. *Scott,* 128 Ark. 600-603, as follows: "The general rule is that no man

can get a title to personal property from a person who himself has no title to it.   There are, however, certain exceptions to the general rule.   One of these exceptions is that a *bona fide* purchaser will be protected where the owner has conferred upon the seller the apparent right of property as owner, or for disposal as his agent." See, also, *Andrews* v. *Cox,* 42 Ark. 473-78; *Meyer, Bannerman & Co.* v. *Stone & Co.,* 46 Ark. 210-214; *Jetton* v. *Tobey,* 62 Ark. 84; *Jarvis* v. *Pague,* 137 Ark. 475-484.

The instruction of the court was in conformity with the doctrine announced in the above cases, and there was testimony to warrant the court in giving it.

The judgment is therefore affirmed.