**SECURITIES INVESTMENT CO. OF ST. LOUIS, Plaintiff,**

v.

**S. A. WILLIAMS, Sr., and Associates Discount Corporation, Defendants.**

**No. LR–60–C–75.**

United States District Court E. D. Arkansas, W. D.

Dec. 30, 1960.

Abner McGehee of Cockrill, Laser & McGehee, Little Rock, Ark., for plaintiff.

Jay Dickey, Pine Bluff, Ark., for defendant H. A. Williams, Sr.

A. L. Barber, of Barber, Henry, Thurman & McCaskill, Little Rock, Ark., for defendant Associates Discount Corporation.

HENLEY, Chief Judge.

This is a replevin suit brought by plaintiff, a Missouri corporation, against S. A. Williams, Sr., a citizen of Arkansas, and Associates Discount Corporation, an Indiana corporation, hereinafter called Discount, to recover possession of a 1959 model Insley Dragline, worth substantially more than $10,000, which was purchased by Williams from the now bankrupt Kern-Limerick, Inc., of Little Rock, Arkansas, on December 1, 1959. Discount is the assignee of a conditional

sale contract covering the machine in question and of a promissory note, both of which instruments were executed by Williams in favor of Kern-Limerick, evidencing and securing the unpaid portion of the purchase price of the machine.

The basis of plaintiff's claim is that on September 15, 1959, Kern-Limerick had sold the machine to Consek, Inc., which corporation executed a conditional sale contract and promissory note in favor of Kern-Limerick, evidencing and securing the unpaid portion of the purchase price of the dragline, and that on the same day Kern-Limerick assigned said instruments to plaintiff for a valuable consideration. Plaintiff contends that by virtue of these instruments its claim to the machine is prior to the claims of the defendants. The defendants take the position that for reasons hereinafter stated their claims are superior to that of the plaintiff.

The case has been tried to the Court, and has been submitted on the pleadings, oral testimony, documentary evidence, and written briefs. This memorandum incorporates the Court's findings of fact and conclusions of law.

The evidence produced by the respective parties is substantially undisputed, and the facts which it discloses may be summarized as follows:

Prior to its bankruptcy in May 1960, Kern-Limerick, Inc., was a large and established dealer in heavy machinery and implements, such as draglines, tractors, and bulldozers. The dominating personality in Kern-Limerick's management was R. C. Limerick, Jr., its manager. The business of Kern-Limerick was the retail sale of machinery of the types mentioned, and it also leased or rented machinery for hire. Typically the retail sale involved a cash down payment or a side note for a down payment, with the balance of the purchase price being evidenced by a conditional sale contract and promissory note in favor of Kern-Limerick signed by the purchaser and payable in monthly installments. It was the custom of Kern-Limerick to discount this type of commercial paper with finance companies such as the plaintiff and Discount. Payments on the notes would be made by the purchasers of the machines directly to the finance companies. The conditional sale contracts reserved title to the machine in Kern-Limerick, and when such contracts would be assigned, the reserved title passed to the respective assignees to be held until the machines covered by the contracts were paid for.

On August 11, 1959, R. C. Limerick, Jr., caused to be formed an Arkansas corporation known as Consek, Inc. Three hundred shares of common stock were issued as follows: 298 to R. D. Webb, the vice-president of Kern-Limerick; one share to C. B. Brooks, the Kern-Limerick office manager; and one share to Griffin Smith, the attorney for Kern-Limerick. All of those shares, according to the evidence, were soon transferred to Mr. Limerick, and he was in fact the owner of Consek.

Consek was organized for the ostensible purpose of engaging in the business of renting and leasing equipment for hire. It appears that Consek did in fact rent or lease some equipment during the period with which the Court is concerned, but it derived no substantial income from that activity. Consek had no separate place of business, no warehouse or parking lot, and no employees. Mr. Webb was president of Consek and Mr. Brooks was secretary. Mr. Limerick and Mr. Webb were on the board of directors, but according to Mr. Brooks's testimony no meeting of the directors was ever held.

Consek purchased a number of machines from Kern-Limerick, executing conditional sale contracts and promissory notes as security for the purchase price, which contracts and notes were assigned to finance companies. Some of the machines that Consek bought were painted black and displayed Consek's corporate name. Those machines were usually kept together on the Kern-Limerick lot on Asher Avenue in the City of Little Rock. Other machines purchased by Consek were not so distinguished, and were kept on the Kern-Limerick lot and

mingled indiscriminately with other machines which Kern-Limerick owned and was offering for sale to the public.

Consek had no resources with which to make payments on the machines purchased by it, and in order to enable it to make its payments each month Kern-Limerick advanced necessary funds against which Consek drew its own checks payable to the finance companies holding its paper.

Both plaintiff and Discount maintain branch offices in Little Rock, and both were familiar with the Kern-Limerick operation and with the organization and corporate purpose of Consek. They also knew that machines sold by Kern-Limerick to Consek were to be kept on the Kern-Limerick lot except when in use by persons who might lease or rent such machines. Both plaintiff and Discount from time to time purchased commercial paper from Kern-Limerick, including conditional sale contracts and notes executed by Consek.

The machine involved in this case was purchased by Kern-Limerick from the Insley Manufacturing Company, was paid for by a Kern-Limerick check, and was delivered to Kern-Limerick on September 3, 1959. Said machine, orange in color with a black trim, was placed on the Kern-Limerick lot and was exposed for sale along with other machines owned by Kern-Limerick.

On September 15, 1959, the machine was sold by Kern-Limerick to Consek for a total price of $25,000. The conditional sale contract executed by Consek shows a cash down payment of $5,000 (probably fictitious), and an unpaid balance of the purchase price plus carrying charges, amounting to $23,079.96, which was to be retired at the rate of $641.11 per month, the first payment falling due on October 15, 1959. The contract and note were assigned with recourse to plaintiff for a consideration of $20,000.

The machine was never physically delivered to Consek, nor was its physical appearance changed in any way after Consek's purchase. It was not segregated from other machines owned by Kern-Limerick, but remained on the lot without anything to distinguish it from other Kern-Limerick machines or to indicate that Kern-Limerick had parted with title. In view of the relationship between Consek and Kern-Limerick, the situation as to the machine was, of course, known to Consek. Plaintiff made no inspection of the machine either before or after it purchased the Consek contract and note. As indicated, plaintiff knew and expected that the machine would be kept on the Kern-Limerick lot except when it was in use by a renter or lessee.

On or about December 1, 1959, defendant Williams, accompanied by his two sons, called on Kern-Limerick with the end in view of purchasing a new dragline. Prior to that visit, Williams had been called upon by one of the Kern-Limerick salesmen, Mr. P. A. Prince. Prince was not at the Kern-Limerick lot when Mr. Williams called, and Mr. Limerick personally showed Williams both the machine in question and a slightly heavier machine, also manufactured by the Insley Manufacturing Company, which was parked next to it. After examining the machines, Mr. Williams decided to purchase the lighter of the two and terms were agreed upon. Mr. Williams then returned to his own place of business in Pine Bluff.

Kern-Limerick notified Prince of the deal that had been made with Williams, and Prince went immediately to Pine Bluff from Warren, Arkansas, where he had been attending to some other business. A conditional sale contract covering the dragline purchased by Williams was prepared at Little Rock, and was carried by messenger to Pine Bluff where it, together with the note incident thereto, was signed by Williams in the presence of Prince and Billy G. Marr, another Kern-Limerick employee, who had carried the papers from Little Rock to Pine Bluff. The machine was delivered to Williams the same day. The price which Williams agreed to pay for the machine was $26,179.48. The contract called for a down payment of $4,600.00,

with the balance of $21,579.48 to be paid in monthly installments of $599.43 each, the first falling due on January 10, 1960. That contract and the accompanying note were sold to Discount for $18,698.62. The $4,600.00 down payment was made by means of a side note executed by Williams, which note is now owned by the First National Bank of Little Rock.

When Williams purchased the machine, he had no knowledge or notice whatever of the fact that there had been a prior sale to Consek. He believed, and was fully justified in believing, that the machine was a part of the Kern-Limerick stock in trade, and that Kern-Limerick had a right to sell it.[1] As a matter of fact, Williams had no idea that any person or corporation, other than Discount, was asserting any interest in the machine until this action was commenced and the Marshal executed the order of possession which had been issued by this Court. Similarly, when Discount purchased the Williams paper, it had no notice of the prior sale to Consek.

When the machine was sold to Williams, the Consek payments to plaintiff were current. After the sale to Williams, Consek made additional payments to plaintiff through March 1960 with funds advanced by Kern-Limerick. The installment of the Consek note which fell due in April 1960 was not paid, and no other payments have been made by Consek.[2]

Williams made regular payments to Discount down to the commencement of this action. After the suit was filed, it was agreed that Williams might remain in possession of the machine and make future payments into the registry of the court, and this he has done.

In sum, the Court is confronted with a situation created by the conduct of an original owner who has sold the same chattel twice and who has put into circulation and obtained the proceeds of two sets of commercial paper covering the same chattel. The question for decision is whether plaintiff, as the holder of the earlier conditional sale contract and note, is entitled to prevail over the subsequent innocent purchaser of the machine and the finance company which acquired the contract and note executed by such subsequent purchaser.

It is the theory of the plaintiff that when Kern-Limerick sold the machine to Consek and then assigned the Consek contract and note, it divested itself of all title to the property, that Williams took nothing by his purchase, and that his contract and note, which Discount purchased, were nullities.

In resisting the claim of the plaintiff Williams and Discount advance three contentions: (1) that the "sale" of the dragline to Consek was not a bona fide sale at all, but a mere sham; (2) that said "sale" to Consek followed by the assignment of the Consek paper to plaintiff was part of a "floor-planning" arrangement to enable Kern-Limerick to obtain funds to pay for equipment purchased from manufacturers, and that the true nature of the transaction was known to plaintiff or could have been ascertained by it through the exercise of reasonable diligence; and (3) that the dragline was left on the Kern-Limerick sales lot available for sale to the general public, a situation which, it is claimed, was known to plaintiff or could have been known to it, that Williams purchased the dragline in good faith and for value, and that plaintiff in the circumstances is estopped from asserting any claim to the machine.

1. It is noted that the Arkansas Motor Vehicle Registration Law does not apply to construction equipment such as draglines, and that Arkansas makes no provision for the recording of conditional sale contracts covering personal property. There is, therefore, no question of any record notice in this case.

2. The record does not reflect the present status of Consek, but in the circumstances which have been outlined it is fairly inferable that the bankruptcy of Kern-Limerick has destroyed Consek for all practical purposes.

Since all of the relevant transactions affecting the property in suit took place in Arkansas, it is clear that the rights of the parties to this diversity case are governed by the law of this State. Arkansas has not adopted the Uniform Conditional Sales Act, and conditional sales are expressly excluded from the provisions of the Uniform Sales Act, which is in force here. See Section 76c of the Arkansas version of the Act, Ark.Stats., § 68–1479. Hence, the Court is required to turn to the common law of Arkansas.

The basic problem presented by the record in this case is not novel in Arkansas law. Kern-Limerick is by no means the first, and may not be the last, Arkansas merchant to deem it advantageous to sell the same chattel twice or to circulate two sets of commercial paper covering the same chattel.

■ Assuming that the initial transaction is valid as between the immediate parties thereto, including an assignee of the vendor, the question is whether such transaction is binding upon subsequent purchasers from the vendor who pay value and have no notice of the prior transaction, and upon persons who may stand in the shoes of such innocent purchasers. The Arkansas courts have answered that question in the particular cases in which it has arisen by appraising the sufficiency and actuality of the original sale, as such, and by the application of conventional principles of agency and estoppel, including the principle that where one of two persons must suffer on account of the fraud of a third, he who by his own conduct or neglect made the fraud possible or facilitated its perpetration must bear the loss. See e. g. G. H. Hardin & Co. v. Nettles, 192 Ark. 610, 93 S.W.2d 315; Smith v. Kirkpatrick Finance Co., 181 Ark. 1031, 28 S.W.2d 1050; Buchanan v. Commercial Investment Trust, 177 Ark. 579, 7 S.W. 2d 318; Commercial Credit Co. v. Hardin, 175 Ark. 811, 300 S.W. 434; Liveoak v. Hopper, 172 Ark. 362, 288 S.W. 887; McDermott v. Kimball Lumber Co., 102 Ark. 344, 144 S.W. 524, 39 L.R.A.,N.S., 461; Anderson-Tully Co. v. Rozelle, 68 Ark. 307, 57 S.W. 1102; Jetton v. Tobey, 62 Ark. 84, 34 S.W. 531; Hight v. Harris, 56 Ark. 98, 19 S.W. 235; Davis, Mallory Co., v. Meyer & Co., 47 Ark. 210, 1 S.W. 95; Puckett v. Reed, 31 Ark. 131.

■ The Arkansas cases just cited, and others that might be mentioned, establish that where the original transaction is a valid and completed sale, with a bona fide intent to transfer title from vendor to vendee either immediately or upon the fulfillment of a condition, then, in the absence of some element of agency or estoppel, the transaction is binding upon creditors of the vendor and upon subsequent purchasers even where they may buy for value and without notice.

Underlying the decisions of the Supreme Court of Arkansas has been a recognition of the principle that a stream can rise no higher than its source, and that ordinarily one who buys from a vendor who has no title obtains none, no matter how much he may pay or how honestly he may buy. G. H. Hardin & Co. v. Nettles, supra; Forrest v. Benson, 150 Ark. 89, 233 S.W. 916; Warren Stave Co. v. Hardy, 130 Ark. 547, 198 S.W. 99, L.R.A.1918B, 183; Jones v. Southern Cooperage Co., 94 Ark. 621, 127 S.W. 704; Andrews v. Cox, 42 Ark. 473; Smith v. Jones, 8 Ark. 109. On the other hand, the Arkansas court has also recognized that circumstances may exist in which it would be in the highest degree inequitable to permit the true owner to assert a latent title against an innocent purchaser for value and without notice. See Smith v. Kirkpatrick Finance Co., supra; Buchanan v. Commercial Investment Trust, supra; Rogers v. Scott, 128 Ark. 600, 194 S.W. 689.

■ Estoppel aside, in order for a sale of personal property to be binding on subsequent innocent purchasers, there must be an actual or constructive delivery of the property to the vendee, or at least an agreement whereby the vendor holds the property as bailee for the purchaser. Smith v. Kirkpatrick Finance Co., supra; McDermott v. Kimball Lum-

ber Co., supra; Shaul v. Harrington, 54 Ark. 305, 15 S.W. 835.[3]

Speaking of the necessity and sufficiency of delivery in connection with sales of personal property, the Supreme Court of Arkansas in McDermott v. Kimball Lumber Co., supra, had this to say (at page 349 of 102 Ark., at page 526 of 144 S. W.):

> " * * * In the sale of personal property, the delivery of the thing sold is essential as against the rights of third parties asserting a title, right or interest therein subsequently acquired from the seller. A delivery may be either actual or constructive, and in either event it will be effective to pass title. Where property is of such a nature and so situated that actual delivery thereof can be made, then that is necessary. Where the property is too ponderous and bulky for an actual change of its possession, a symbolical or constructive delivery thereof will be equivalent to and effective as an actual delivery. The delivery of such property may be made by doing everything necessary to identify it, and by placing on it outward indicia to show a change of the possession and ownership."

From a consideration of what it deems to be the most relevant Arkansas decisions, the Court has concluded that the defendants are entitled to prevail. Assuming without deciding that the separate corporate entity of Consek should be recognized, there was never any sale to Consek which would be valid as to innocent third parties. Moreover, assuming a sale to Consek, plaintiff is estopped from asserting any title to the machine against Williams or against Discount which stands in his shoes. The evidence does not disclose that Consek was even given a bill of sale covering this dragline. All that appears is that Consek signed a title-retaining conditional sales contract and a note, which Kern-Limerick assigned to plaintiff. There is no evidence that there was any agreement between Consek and Kern-Limerick whereby the latter was to hold the dragline as bailee for the former, and there was no delivery, either actual or constructive, of the machine to Consek.

It is manifest that the machine was susceptible of physical delivery to Consek. It could have been painted black and the name "Consek" inscribed upon it. It could have been segregated on the lot away from the Kern-Limerick stock-in-trade, or, at the very least, some tag or sign could have been placed upon it which would indicate that it had been sold to Consek and was no longer a part of the Kern-Limerick inventory. Nothing of the kind was done. The machine was simply left where it had been placed originally as part and parcel of the Kern-Limerick machinery. There was no intention to deliver, no delivery, no sale. The "sale" was merely a paper transaction which enabled Kern-Limerick to get $20,000 from the plaintiff while retaining possession of the machine and full power to sell it and make delivery to the first willing buyer that might appear.

In Smith v. Kirkpatrick Finance Co., supra, one Stroud, who was president, general manager, and majority stockholder of the Jonesboro Machine Company, a corporation which was in the automobile business, purported to purchase an automobile for himself from his company. He executed a conditional sale contract and a series of promissory notes in favor of the corporation, and endorsed the notes in his capacity as president of the corporation. The contract and notes were then sold to Smith. Stroud took no possession of the car which remained as part of the inventory of the Jonesboro Machine Company and was later sold to one Marlar who bought for value and without notice. Marlar executed a title-retaining conditional sale contract in fa-

3. Delivery is essential to a sale even where no rights of strangers to the sale are involved. See Bank of Wynne & Trust Co. v. Stafford & Wimmer, 129 Ark. 172, 195 S.W. 397, which deals with alleged delivery of an unsegregated quantity of brick.

vor of the company and a note, which were later assigned to Kirkpatrick Finance Co. The Jonesboro Machine Company falling into insolvency, as did Kern-Limerick in this case, litigation developed between Smith and the finance company as to which had priority with respect to the automobile in question.

It was decided that the rights of the finance company were superior to those of Smith on the ground that the original "sale" to Stroud lacked actuality, and on the ground that Smith at all times knew or was on notice that the car would be offered for sale to the general public. Speaking of the validity of the sale the Court said, among other things (at pages 1033 and 1034 of 181 Ark., at page 1051 of 28 S.W.2d):

" * * * But here there was no sale in good faith. Not only was this attempted sale by Stroud to himself, but there was no delivery and no intention to deliver. The automobile remained in the possession of the corporation just as it was before, had a dealer's tag on it, was apparently a new car and was in fact sold two days after the notes were delivered to Smith, to Marlar as a new car. No pretense was made of delivery. 'For as we understand the law, in order to make the sale effectual against subsequent purchasers or attaching creditors, there must have been actual delivery, a visible and substantial change in the possession.' Davis, Mallory & Co. v. Meyer & Co., 47 Ark. 210, 1 S.W. 95.

"This court later held that it was not necessary in all cases that there be actual and visible possession by the vendee, and the court said: 'Whenever there is a completed contract of sale and an agreement by the vendor to hold as bailee for the vendee in lieu of actual delivery, the sale is complete against creditors, if it is not otherwise fraudulent.' Shaul v. Harrington, 54 Ark. 305, 15 S.W. 835.

"Under the doctrine announced in the last case there was no sale here.
* * * *"

The facts in Smith v. Kirkpatrick Finance Co., supra, are quite similar to those now before the Court, and the reasoning in Smith is persuasive here.

Turning now to the question of estoppel, it has been observed that plaintiff was familiar with the Kern-Limerick operation. Plaintiff knew the circumstances of the organization of Consek, and it must have known that Consek was under the effective control of Mr. Limerick. It also knew that machinery sold to Consek was to be kept on the Kern-Limerick sales lot except when in use by renters or lessees.

In those circumstances, plaintiff should have anticipated the possibility that Kern-Limerick would do just what it did, namely, re-sell the machine to an innocent third party. The plaintiff could have protected itself easily against such an eventuality. It maintained a branch office in Little Rock in charge of a branch manager. It would have been simple for plaintiff to have required that the machine be separated from other Kern-Limerick machinery, or that some indicia of Consek ownership be affixed to the machine. Had such been done, Mr. Williams would not have been misled, and the fraud could not have been perpetrated.

Mr. Williams, on the other hand, had no practical way to protect himself. No official record that he might have searched would have revealed the interest of Consek and the plaintiff in this dragline, and there was no way in which he could have learned of their claim unless some employee of Kern-Limerick had chosen to tell him. Had the officials of Kern-Limerick been inclined to give truthful information about the machine, either on their own volition or upon inquiry, it is doubtful that they would have undertaken to sell it to Mr. Williams in the first place. Further, when a purchaser goes into a place of business to buy merchandise there displayed for sale

he is not required to ask the merchant whether he owns the wares and is authorized to sell them. The purchaser is invited into the place of business to buy, and he has the right to assume that the merchant has the right to sell.

In the Court's view the failure of plaintiff to take any action to protect itself, when it could have done so easily, precludes it from asserting its title against that of Williams and Discount.

In Buchanan v. Commercial Investment Trust, supra, the Court cited with approval the Virginia case of Gump Investment Co. v. Jackson, 142 Va. 190, 128 S.E. 506, 47 A.L.R. 82, and summarized the Gump decision as follows (at page 584 of 177 Ark., at page 320 of 7 S.W. 2d):

> "In [Gump] it was held that an automobile financing company, which permits a dealer to keep a new car in his salesroom after a pretended sale under a recorded conditional sales contract, the note representing the purchase price of which, and the contract securing the same, it has purchased, must bear the loss, where the dealer sells the car to an innocent purchaser for cash, which he retains, and becomes insolvent without satisfying the note."

The facts in Gump, like those in Smith v. Kirkpatrick Finance Co., supra, closely resemble the facts in the case at bar. In the Gump case the Joe S. Kite Company, an automobile agency, had an employee by the name of Sutton. An automobile was purportedly sold by Kite to Sutton's wife. She executed a conditional sale contract and note in favor of Kite, which was recorded in accordance with Virginia law, and was thereafter sold by Kite to the investment company which bought for value and in good faith. Actually, the automobile was never delivered to Mrs. Sutton but remained in the Kite agency as part of its stock-in-trade until it was sold to Jackson who paid cash for it. Jackson had no notice of the purported sale to Mrs. Sutton. The Kite Company did not satisfy the Gump lien but instead turned over to Sutton the amounts of several monthly payments, which amounts were paid to Gump. Thereafter, and before the Gump claim was satisfied, Kite was adjudicated a bankrupt. Mr. and Mrs. Sutton were at all times insolvent. It was held that the Jackson title was superior to that of the investment company, the holding being based on estoppel. In reaching that result the Virginia court cited its own earlier decisions in Boice v. Finance & Guaranty Corp., 127 Va. 563, 102 S.E. 591, 10 A.L.R. 654; O'Neil v. Cheatwood, 127 Va. 96, 102 S.E. 596, both of which decisions were cited by the Supreme Court of Arkansas in Coffman v. Citizens' Loan & Investment Co., 172 Ark. 889, 290 S.W. 961.

When Buchanan and Smith are read in connection with the Virginia cases which have been mentioned, and which have been approved by the Supreme Court of Arkansas, it seems clear that the law of Arkansas is that where a chattel is sold on conditional sale, but is permitted to remain in the possession of a dealer-vendor who intends to re-sell it, and where that situation is known to the original vendee, the title of the latter is inferior to that acquired by a subsequent bona fide purchaser from the vendor; and that rule extends to a finance company which has purchased the paper of the original vendee, at least where the company knows or is on notice that the chattel remains in the hands of the dealer-vendor as part of his stock-in-trade and is available for re-sale.

Support for the position of the plaintiff in this case is found in Commercial Credit Co. v. Hardin, 175 Ark. 811, 300 S.W. 434. Stated in a somewhat simplified form, the facts in Hardin were that the owner of an automobile placed it in the hands of a dealer to be sold. The dealer first made a fictitious sale of the car to one of his employees, taking the

**270**

latter's conditional sale contract and note in payment, which contract and note were assigned to Commercial Credit Co. which bought for value and without notice of the nature of the transaction. The car remained in the dealer's possession and he subsequently sold it to an innocent purchaser in due course of business. As between the finance company and the subsequent purchaser, it was held that the rights of the former were superior since it had bought the paper without notice of the true situation.

Unfortunately for the plaintiff, however, Hardin is an earlier decision than either Buchanan or Smith, and its authority may have been seriously impaired by those later decisions. Moreover, in the Hardin case the Court found that the finance company was completely innocent. Such is not the case here. Plaintiff knew what Consek was and knew, in addition, that the dragline remained on the Kern-Limerick lot and under the effective control either of that company or of Mr. Limerick, who was the dominating personality in both Kern-Limerick and Consek.

But the Court need not speculate on whether, in view of Buchanan and Smith the Supreme Court of Arkansas would now follow Hardin were the same set of facts presented. Suffice it to say that the Court is convinced that the Arkansas court would not apply the rule of the Hardin case to the facts of this case.

For the reasons above stated, a judgment will be entered dismissing the complaint with prejudice and at the cost of the plaintiff. However, since neither defendant has shown any damages resulting from the initial seizure of the dragline by the Marshal, the judgment will provide that both the plaintiff and the surety on its replevin bond will be discharged from any liability on that obligation. The moneys paid into the registry by Williams will be disbursed to Discount.