JAMES TALCOTT, INC., Appellant,

v.

ASSOCIATES DISCOUNT CORPORA-
TION and Mr. and Mrs. F. O. McCon-
nell d/b/a McConnell Heavy Hauling,
Appellees.

No. 16800.

United States Court of Appeals
Eighth Circuit.

April 18, 1962.

Rehearing Denied May 9, 1962.

**444**

W. P. Hamilton, Jr., of Moore, Chowning, Mitchell, Hamilton & Burrow, Little Rock, Ark., for appellant.

A. L. Barber, of Barber, Henry, Thurman & McCaskill, Little Rock, Ark., for appellee.

Before VOGEL, VAN OOSTERHOUT and BLACKMUN, Circuit Judges.

BLACKMUN, Circuit Judge.

This diversity case, with jurisdiction established, is a replevin action to recover possession of a dragline which was the subject of a double sale and double financing by a now bankrupt seller. The suit was instituted by James Talcott, Inc., the assignee of the purchase paper in the second sale, against Associates Discount Corporation (and others whose status on this appeal is not now important), the assignee of the purchase paper in the first sale. The case was tried to the court and resulted in a dismissal with prejudice. 193 F.Supp. 642. Talcott appeals.

The facts are not in substantial dispute. They are largely developed in the trial court's reported decision. We list the basic ones chronologically:

1. In September 1957 Associates and Kern-Limerick, Inc., a Little Rock dealer in heavy construction equipment, executed an agreement reciting conditions under which Associates would purchase conditional sale contracts from Kern-Limerick. This agreement, as modified, provided that Kern-Limerick warranted its contracts to be genuine and free from defenses; that each contract would evidence a valid reservation of title; that repossessed property might be stored upon the premises of Kern-Limerick without cost; that upon repossession Kern-Limerick would pay all delinquent instalments and thereafter all instalments becoming due; and that by 120 days after repossession Kern-Limerick would pay the balance in full.

2. In November 1958 Kern-Limerick sold the dragline to H. D. Stayton. This was a bona fide sale. Stayton executed the usual form of note and conditional sale contract providing for retention of title in the vendor and for the payment of the cost balance, remaining after trade-in allowance and down payment, in 36 monthly instalments. The contract was immediately assigned for value by Kern-Limerick to Associates. The note was indorsed by Kern-Limerick with recourse. The required monthly instalments were thereafter received by Associates with fair regularity; some of them came direct from Stayton and others from Kern-Limerick on Stayton's behalf.[1]

3. In August 1959 Stayton became dissatisfield with the dragline's performance and it was taken to Kern-Limerick for repairs. It was never returned to Stayton. In September he traded it in for another dragline. Kern-Limerick treated this as a repossession on its books. Kern-Limerick was obligated, upon the trade-in, to pay Associates the entire remaining balance on the Stayton account. It did not do so. With Stayton's aid it concealed the trade-in from Associates. This was accomplished by changing the serial number on Stayton's new dragline to coincide with the serial number on the old and by continuing payments required under the conditional sale contract and note primarily through the device of Kern-Limerick paying Stayton and Stayton issuing his own check

---

1. This variance as to the source of each monthly payment apparently was not unusual with respect to slow accounts in the Associates—Kern-Limerick relationship.

to Associates with no notation as to the source of his funds.

4. In November 1959 Kern-Limerick resold the dragline to J. W. Spires, an *innocent purchaser.* Spires executed a conditional sale contract and accompanying note calling for monthly payments and the vendor's retention of title. These were immediately assigned by Kern-Limerick to Talcott. The required monthly payments were made by Spires with fair regularity. This resale was unknown to Associates.

5. In early April 1960, upon a routine collection call by Associates' representative, Stayton's wife stated that her husband did not have the original dragline, that he had not had it for some time, and that he was making the monthly payments to Associates with Kern-Limerick aid. On inquiry of Stayton he, however, denied this. The representative then inspected the machine in Stayton's possession and was satisfied, because of its falsified serial number, that it was the original. Thus, despite Mrs. Stayton's confession, Kern-Limerick and Stayton managed to satisfy Associates of the regularity of the situation at that time. Even another instalment payment to Associates on Stayton's contract was thereafter made.

6. In May Kern-Limerick went into bankruptcy.

7. In June Associates, having learned that Spires had the dragline, took possession of it. Talcott then instituted this action.

During the two and one-half years prior to its bankruptcy, Kern-Limerick had sold Associates 376 contracts, all "with recourse", with about 50 repossessions. The general course of dealing between Associates and Kern-Limerick as to repossessions on the one hand and trade-ins on the other is of interest.

With respect to slow accounts and *repossessions* the record shows that Kern-Limerick assisted in collections and occasionally, because it was obligated eventually to pay the balance on the contract if there was repossession, made a payment from its own funds to Associates to keep an account current; that Associates knew of such payments by Kern-Limerick; that Associates permitted Kern-Limerick to repossess property upon delinquent accounts and to do so with a fairly free hand; and that it allowed Kern-Limerick to place repossessed equipment on its lot, without segregation from its own property and without indication of Associates' existing interest, and to offer the equipment for sale to prospective buyers. Associates made an initial inspection at the time of any repossession and semi-monthly spot checks of property on the Kern-Limerick lot. On occasion a machine would be missing; Associates would then demand immediate payment in full from Kern-Limerick. When repossessed property was sold Kern-Limerick was required promptly to pay the outstanding balance. At times pressure had to be exerted on Kern-Limerick. A new buyer was not informed that the property he was buying had been repossessed or was subject to an outstanding contract. Except as noted, Associates said its dealings with Kern-Limerick as to repossessions were satisfactory.

With respect to *trade-ins* the record, while not clear that any concerning Associates had taken place in the past, indicates in any event that Kern-Limerick would advise Associates when a customer wanted to trade-in equipment on which Associates held a contract. Kern-Limerick would then be required to pay the outstanding balance and would not be allowed merely to receive the property, pay up delinquent instalments, and display it on the lot for sale as was done for up to 120 days with repossessed property.

Talcott's basic argument here is that Associates was lax in its overall daily dealings with Kern-Limerick, exercised only minimal control, and was well aware of Kern-Limerick's propensity to stray from the terms of its agreements with others; that it thus placed Kern-Limerick in a position to do harm to innocent third persons and, specifically, to Spires and Talcott; that it never repudiated a

sale; that its course of conduct with respect to repossessed equipment, viz., its acquiescence in the indiscriminate placement on the lot without identification and in the offering for sale, estops Associates from asserting its legal title as a defense; and that any claimed distinction between repossession and trade-in is a distinction without a difference so far as rights of third parties are concerned. Associates resists replevin on the ground that its title to the dragline arose out of the first sale; that no title was obtained by Spires in the unauthorized second sale out of which Talcott's asserted interest comes; and that its own conduct did not at all provide grounds for estoppel.

The trial court, in deciding the case against Talcott, placed some emphasis upon the fact that this was not a controversy between an innocent purchaser for value and the assignee of an existing conditional sale contract but was, instead, one between two assignee finance companies which dealt with Kern-Limerick on substantially the same terms. It concluded that the situation was one for the application of the usual rule that one who purchases from a vendor who has no title obtains none, and it rejected Talcott's estoppel arguments.[2]

The only issue here is whether the facts give rise to estoppel.

■ Arkansas law, of course, governs. Until the adoption by Arkansas of the Uniform Commercial Code, Acts 1961, No. 185, now Arkansas Statutes, Title 85, effective at midnight on December 31, 1961, there was no general provision for the recording in Arkansas of a conditional sale contract; also the Arkansas Motor Vehicle Registration Law, particularly §§ 75–160 and 75–161 of Arkansas Statutes, adopted in 1949, has no application to construction equipment such as the dragline here. Securities Investment Co. of St. Louis v. Williams, E.D.Ark., 1960, 190 F.Supp. 261, 265, footnote 1. There is no factor, therefore, of any record notice in this case. Further, because the pertinent events all took place prior to 1962, because Arkansas had not adopted the Uniform Conditional Sales Act, and because its version of the Uniform Sales Act had been made specifically inapplicable to conditional sales, Arkansas Statutes § 68–1479 (now repealed by the Uniform Commercial Code); Cloud Oak Flooring Co. v. J. A. Riggs Tractor Co., 1954, 223 Ark. 447, 266 S.W.2d 284, 287; Gentry v. Little Rock Road Machinery Company, 1960, 232 Ark. 580, 339 S.W.2d 101, 103, it is Arkansas common law which is applicable. Securities Investment Co. of St. Louis v. Williams, supra, p. 266 of 190 F.Supp.

Reference to certain general principles of Arkansas law is perhaps in order:

■ 1. Estoppel is said to be the effect of the voluntary conduct of a party whereby he is precluded from asserting rights which perhaps otherwise might exist against another person who in good faith has relied upon such conduct and has been led thereby to change his position for the worse. Sovereign Camp, Woodmen of the World v. Newsom, 1920, 142 Ark. 132, 219 S.W. 759, 768, 14 A.L.R. 903; Gambill v. Wilson, 1947, 211 Ark. 733, 202 S.W.2d 185, 187; Dobbins v. Martin Buick Co., 1950, 216 Ark. 861, 227 S.W.2d 620, 622.

■ 2. The burden of establishing estoppel is on the one who asserts it. Watson v. Murray, 1891, 54 Ark. 499, 16 S.W. 293, 296; Van Bibber v. Hardy, 1949, 215 Ark. 111, 219 S.W.2d 435, 438. See Crossett Lumber Co. v. United States, 8 Cir., 1937, 87 F.2d 930, 931.

■ 3. Inasmuch as "estoppel bars the truth to the contrary, the party setting it up must prove it strictly". Arkansas Nat. Bank v. Boles, 1910, 97 Ark. 43, 133 S.W. 195, 197.

■ 4. Where one of two innocent persons must suffer because of the fraud of a third, the one who, by his own conduct or neglect, made the fraud possible

---

2. The court also rejected Talcott's alternative arguments that Kern-Limerick was Associates' agent in effecting the second sale and that Associates ratified that sale. These alternatives are not pressed on this appeal.

or facilitated its perpetration is the one who must bear the loss. Securities Investment Co. of St. Louis v. Williams, supra, p. 266 of 190 F.Supp., and Arkansas cases cited.

5. "Estoppels * * * depend upon facts, which are rarely in any two cases precisely the same". Jowers v. Phelps, 33 Ark. 465; Williams v. Davis, 1947, 211 Ark. 725, 202 S.W.2d 205, 208; Dobbins v. Martin Buick Co., supra, p. 622 of 227 S.W.2d.

6. But "a stream can rise no higher than its source, and * * * ordinarily one who buys from a vendor who has no title obtains none, no matter how much he may pay or how honestly he may buy". Securities Investment Co. of St. Louis, supra, p. 266 of 190 F.Supp., and Arkansas cases cited.

The rule last stated has been applied to successive sales and, specifically, to the situation where the first vendor has a title-retaining contract pending full payment and his vendee (who becomes the second vendor) has possession of the property. The rationale of these cases is that the first vendee has nothing more than mere possession of the property and that this is only prima facie evidence of ownership which in itself is insufficient apart from statute to estop the original vendor in the absence of other indicia of ownership. McIntosh v. Hill, 1886, 47 Ark. 363, 1 S.W. 680; Simpson v. Shackelford, 1887, 49 Ark. 63, 4 S.W. 165; Triplett v. Mansur & Tebbetts Implement Co., 1900, 68 Ark. 230, 57 S.W. 261, 262; Meyer v. Equitable Credit Co., 1927, 174 Ark. 575, 297 S.W. 846, 847; Williams v. Clement, 1934, 189 Ark. 406, 72 S.W.2d 529, 530; Dobbins v. Martin Buick Co., supra, p. 622 of 227 S.W.2d; Citizens Bank of Booneville v. Miller, 1951, 219 Ark. 24, 239 S.W.2d 1021. Compare West v. General Contract Purchase Corp., 1952, 221 Ark. 33, 252 S.W.2d 405, 407.

Where, however, the first sale is made in anticipation of a resale by the vendee, that is, where it is made to one who is not the expected consumer or user of the property or, in other words, where the title-retaining vendor delivers possession of the property to his vendee with knowledge that the vendee will offer it for resale with no indication to prospective buyers of the original vendor's outstanding title or interest, the stated rule does not apply. Then estoppel principles are invoked. Rogers v. Scott, 1917, 128 Ark. 600, 194 S.W. 689; G. H. Hammond Co. v. Joseph Mercantile Co., 1921, 148 Ark. 611, 231 S.W. 875, 879; Smith v. Kirkpatrick Finance Co., 1930, 181 Ark. 1031, 28 S.W.2d 1050; Securities Investment Co. of St. Louis v. Williams, supra, pp. 268–270 of 190 F.Supp.

From the foregoing it follows, it seems to us, that had this dragline been *repossessed* by Kern-Limerick and, without special identification, placed for sale on its lot, Talcott would clearly be entitled to replevy it. In that case Associates, by its own established course of conduct with Kern-Limerick, and despite lack of knowledge on its part, would have made it possible for a bona fide purchaser for value, and the bona fide purchaser of that vendee's paper, each without notice of Associates' interest, to be misled to their detriment if Associates' prior title interest could then be asserted. All the elements of estoppel would be present and the group of Arkansas cases last cited would have direct application. Judge Young, who tried this case below, specifically so held just two months later in another Kern-Limerick situation involving a triple sale and triple financing. James Talcott, Inc. v. Hughes, E.D.Ark., June 21, 1961 (unreported). Talcott there was the third finance company, Associates the second, and Securities Investment the first; with two successive repossessions involved, Securities' and Associates' prior courses of conduct served, among other reasons, to foreclose their claims of priority over Talcott.

Here, however, we do not have a situation of permissive repossession and resale in accord with prior conduct. We have, instead, a trade-in and a record which, if not silent as to trade-ins, at least shows conduct on the part of Associates inconsistent with the permissive

attitude which prevailed as to repossessions.

■ Were this trade-in isolated from the penumbra of the repossession practice, there would be little or no justification for the invocation of estoppel principles. Where an owner of property is deceived so that another takes possession and disposes of it, the owner is not estopped to deny his title against a bona fide purchaser for value from the wrongdoer. Blaylock v. Herrington, 1952, 219 Ark. 939, 245 S.W.2d 576, 577. It has been said that if this were not so, a thief would be in a position to divest the real owner of the title to property by stealing and reselling it. Jetton v. Tobey, 1896, 62 Ark. 84, 34 S.W. 531, 533.

■ But we are confronted here with the repossession practice and our question, therefore, is whether Associates' course of conduct as to repossessions requires that like legal consequences flow from the trade-in. The affirmative of that proposition has, perhaps, some appeal inasmuch as this dragline found its way to the Kern-Limerick lot and rested there available for sale to a bona fide purchaser for value.

This trade-in was secret, unauthorized and without the knowledge of Associates. It was achieved through the connivance of Kern-Limerick and Stayton. Associates assumed, and properly, that the dragline continued to be in the hands of Stayton, the ultimate user, made routine inspections to verify this, rechecked when contrary evidence appeared, and was the victim of positive acts of deceit. And, unlike the repossession situation, there was no substantial delinquency in payment of the Stayton instalments; it thus was not a case of a defaulted contract. We bear in mind, too, that estoppel is premised on the assumption that the person to be estopped could have corrected the potentially harmful situation. Here it is difficult to see what Associates could have done short of terminating entirely its business with Kern-Limerick or placing insignia on the dragline to indicate its property interest in it. It is to be anticipated, however, that those who went to the trouble of effacing and replacing a serial number would also have overcome the deterrent of any insignia. Although the case may be close we, as did the trial court, conclude that under the circumstances present here, including, in particular, the absence of any evidence whatsoever of the handling of traded-in equipment similar to the handling of repossessed equipment, the distinction between repossession and trade-in is sufficient for the application in this case of the usual rule that a purchaser obtains from his vendor only such title as the latter has to give, and that the principles of estoppel are not here applicable.

Talcott heavily relies on four cases which favor the second purchaser or the assignee of his paper: Securities Investment Co. of St. Louis v. Williams, supra; Coffman v. Citizens' Loan & Investment Company, 1927, 172 Ark. 889, 290 S.W. 961; Moss v. Bowman, 1931, 116 Cal. App. 720, 3 P.2d 377; and James Talcott, Inc. v. Hughes, supra. These, however, have to do with circumstances unlike those of the case before us. Thus, in Securities Investment Co., we have a non-bona fide first sale, non-delivery, and knowledge by the finance company assignee of the vendor's retention of the property for resale. In Coffman we have a bank, which held chattel mortgages on an automobile dealer's stock, knowingly allowing the cars to remain in the dealer's possession for sale. In Moss we have a repossession without the finance company's knowledge but the repossession was entirely consistent with prior repossession conduct. And in Hughes we have the two prior finance company assignees acquiescing in the repossessions and the second in effect ratifying the third sale.

We can easily accept these cases and their results upon their facts. But we feel that they are not controlling here. In the present case we have, as already noted, no evidence of prior conduct with respect to trade-ins as distinguished from repossessions, no ratification of the

sale to Spires by Associates' failure to repudiate (because Associates had no knowledge of the sale), no consent by Associates to Kern-Limerick's holding itself out as owner of the Stayton dragline, and no non-bona fide initial sale.

■ The trial court's observation of the fact that both parties to this litigation are finance company assignees "which dealt with Kern-Limerick on substantially the same terms", is an interesting approach. Neither party, however, has argued this factor here and each has assumed, so far as the estoppel question is concerned, that there is an identity of interest between the bona fide purchaser and the finance company which by assignment owns his vendor's title-retaining contract interest. We find it unnecessary to rest our decision on the finance company character of the parties. We decide the case, instead, on general principles of Arkansas estoppel law. We readily reach the result that the trial court's conclusion as to that law was at least a permissible one which this court will not disturb. Homolla v. Gluck, 8 Cir., 1957, 248 F.2d 731, 733–4.

Affirmed.